Gary Thomas ROWE, Plaintiff-Appellee,

v.

Carl GRIFFIN, etc., Defendant,

Hon. Jesse O. Bryan,
Defendant-Appellant.

No. 80–7874.

United States Court of Appeals,
Eleventh Circuit.

May 17, 1982.

John A. Taber, John S. Andrews, Greenville, Ala., for Bryan.

J. Paul Lowery, Montgomery, Ala., Clifford W. Cleveland, Prattville, Ala., for plaintiff-appellee.

Before THORNBERRY *, FAY and HATCHETT, Circuit Judges.

FAY, Circuit Judge:

The District Court for the Middle District of Alabama has permanently enjoined defendant Jesse O. Bryan, the District Attorney for Lowndes County, Alabama, and his successors in office from further prosecution of plaintiff Gary Thomas Rowe for the murder of Viola Liuzzo. 497 F.Supp. 610 (1980). The familiar question on appeal is whether, under *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), this federal court injunction of a pending state criminal prosecution is proper. We find that it is. The prosecution of Rowe is within the "bad faith" exception to the *Younger* doctrine. The order of the District Court is affirmed.

The criminal prosecution of Rowe is related to a murder which occurred seventeen years ago during the Selma to Montgomery Civil Rights March. Mrs. Liuzzo was killed on the evening of March 25, 1965, when her automobile was overtaken and fired upon by Ku Klux Klansmen. At the time of the murder, Rowe was a paid informant for the Federal Bureau of Investigation (FBI), working undercover within the Ku Klux Klan. The day after the murder, Rowe reported it to his FBI contact, explaining that he was with the three Klansmen who killed Mrs. Liuzzo, but that he did not fire a shot at her car. Rowe aided the FBI in locating evidence of the crime and identified the Klansmen as William Eaton, Eugene Thomas, and Collie Wilkins. (Eaton is now deceased.) After being assured of immunity from prosecution by the Attorney General and the Assistant Attorney General of the State of Alabama, who have both since retired from office, and by the FBI, Rowe testified against the Klansmen. He appeared before a state grand jury, in two state murder trials, before a federal grand jury, and in a federal trial. The state trials resulted in a mistrial and in an acquittal, but the Klansmen were convicted by the federal court of violating Mrs. Liuzzo's civil rights. Following the trials, Rowe was relocated and given a new identity by the FBI.

Thirteen years later, District Attorney Bryan attended a district attorneys' conference in Mobile, Alabama. At the conference another district attorney informed Bryan that new information had surfaced regarding the Liuzzo murder. Bryan investigated further and learned that Rowe and the two surviving Klansmen had recently submitted to polygraph tests conducted under the auspices of American Broadcasting Company. Bryan obtained the filmstrip prepared by the television company and the results of the polygraph tests. The test results indicated to Bryan that Rowe had fired the shots which killed Mrs. Liuzzo. Bryan then presented his case to the Lowndes County Grand Jury which returned an indictment for murder against Rowe in September, 1978. Prosecution of Rowe was halted by a federal injunction on October 2, 1980. The injunction was granted by the District Court on the basis that *Younger's* abstention doctrine was inapplicable because the prosecution of Rowe was in bad faith and under extraordinary circumstances. Federal jurisdiction was based on 42 U.S.C. § 1983 and 28 U.S.C. § 1343.[1]

Ordinarily a federal court should refrain from interfering with a pending state criminal prosecution, either by injunction or declaratory judgment. *Younger v. Harris, supra; Samuels v. Mackell*, 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971). Equitable intervention is appropriate only when there exist special circumstances which create a threat of great, immediate, and irreparable injury. *Kugler v. Helfant*, 421 U.S. 117, 123, 95 S.Ct. 1524, 1530, 44

---

* Honorable Homer Thornberry, U. S. Circuit Judge for the Fifth Circuit, sitting by designation.

1. Section 1983 is an "expressly authorized" exception to the federal anti-injunction statute, 28 U.S.C. § 2283. *Mitchum v. Foster*, 407 U.S. 225, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1972).

L.Ed.2d 15 (1975); *Younger*, 401 U.S. at 46, 91 S.Ct. at 751. Prosecutions taken in bad faith or for the purpose of harassment fall within this exception. *Younger*, 401 U.S. at 49–54, 91 S.Ct. at 753; *Fitzgerald v. Peek*, 636 F.2d 943, 944 (5th Cir. 1981); *cert. denied*, 452 U.S. 916, 101 S.Ct. 3051, 69 L.Ed.2d 420 (1981); *Wilson v. Thompson*, 593 F.2d 1375, 1381 (5th Cir. 1979), *aff'd after remand*, 638 F.2d 801 (5th Cir. 1981); *Shaw v. Garrison*, 467 F.2d 113, 119–22 (5th Cir.), *cert. denied*, 409 U.S. 1024, 93 S.Ct. 467, 34 L.Ed.2d 317 (1972).[2] Such a situation is present in this case. We find that, in the absence of credible evidence that Rowe testified untruthfully or otherwise failed to perform his part of the bargain, the prosecution of Rowe, after Rowe was assured of immunity from prosecution by state prosecutors, is *per se* a bad faith prosecution.

The record discloses that on at least one occasion the Attorney General and the Assistant Attorney General of Alabama met with Rowe and FBI agents to discuss the conditions under which Rowe would agree to testify against the Klansmen and a deal was struck: Rowe was given assurances of immunity from prosecution in return for his testimony. This grant of immunity was not specifically authorized by statute, but the state's highest legal officers assured Rowe that he would not be indicted or prosecuted for any of his activity on the occasion of the murder. The quid pro quo of this bargain is obvious. Rowe was literally the prosecution's entire case.

Applying the concept of equitable immunity[3] to the promise made by the state prosecutors, the District Court held that the promise should be enforced, yet inexplicably limited Rowe's immunity to use immunity. This characterization is wrong as a matter of law. The promised immunity was not limited solely to excluding use of Rowe's testimony and evidence derived therefrom in a subsequent prosecution of Rowe; Rowe was told there would be no subsequent prosecution. Thus, Rowe was offered transactional immunity in return for his cooperation and testimony against the Klansmen.[4]

Similar promises have been considered, but not enforced, in *United States v. Calimano*, 576 F.2d 637 (5th Cir. 1978) and *United States v. Weiss*, 599 F.2d 730 (5th

---

**2.** No separate showing of irreparable injury is required when it is evident that the state prosecution is in bad faith or for harassment purposes. *Wilson*, 593 F.2d at 1382; *Shaw*, 467 F.2d at 122.

> In such circumstances the reasons of policy for deferring to state adjudication are outweighed by the injury flowing from the very bringing of the state proceedings, by the perversion of the very process that is supposed to provide vindication, and by the need for speedy and effective action to protect federal rights.

*Younger*, 401 U.S. at 56, 91 S.Ct. at 755 (Stewart, J., concurring), *quoted in Wilson*, 593 F.2d at 1382 n.11.

**3.** The concept of equitable immunity is not well defined. *See United States v. Weiss*, 599 F.2d 730, 735 n.9 (5th Cir. 1979). In the *Whiskey Cases*, 99 U.S. 594, 595, 25 L.Ed. 399 (1878), the Supreme Court indicated that informal promises of immunity should be enforced by application to the executive branch. More recent cases indicate that under appropriate circumstances informal promises may be enforced by the judiciary. *E.g., Weiss, supra; United States v. Goodrich*, 493 F.2d 390 (9th Cir. 1974); *United States v. Sanderson*, 498 F.Supp. 273 (M.D.Fla.1980). *See also United*

*States v. D'Apice*, 664 F.2d 75, 78 n.6. (5th Cir. 1981).

**4.** Rowe testified that he was told he would never be prosecuted for the Liuzzo murder. Record, Vol. 2, at 106. The then Assistant Attorney General, Joe Gantt, confirms that Rowe was offered absolute immunity. His affidavit states that he assured Rowe of immunity from prosecution and that he was present when the Attorney General promised immunity from prosecution. Record, Vol. 1, at 16–17. The then Attorney General, Richmond Flowers, stated that his promise of immunity was limited to the duration of his term in office because Alabama case law would not permit future attorney generals to be bound by such a promise. Record, Vol. 2, at 57. *See Gipson v. State*, 375 So.2d 514 (Ala.1979). Ambiguity over the terms of such a promise should be resolved in favor of the criminal defendant. The District Court found, and we agree, that at the time Rowe gave information to the state officials he had a reasonable expectation that he would be immune from prosecution. If the promise is binding on the state, it is binding according to those terms.

Cir. 1979).[5] In both cases the defendants asserted that they were promised that they would not be prosecuted if they cooperated in obtaining evidence against others. In *Calimano*, the defendant had perjury charges pending against him when he met with the federal prosecutor to discuss fraudulent activities in the home health care industry. It was understood between the parties that Calimano would not answer any questions involving the perjury charges and that he would not testify for the government. Prior to trial Calimano moved to dismiss the indictment, claiming that he submitted to the interview because the prosecutor promised to dismiss the perjury charges. 576 F.2d at 638–39. The court, however, agreed with the prosecutor that no firm commitment had been made to drop the charges. Moreover, Calimano was not prejudiced by his cooperation, because he made no self-incriminating statements, was asked no questions regarding the perjury charges, and was not called by the government to testify against his confederates. *Id.* at 640. In *Weiss*, FBI agents confronted Weiss with evidence they had amassed against him and suggested that if he cooperated with federal prosecutors, the prosecutors might be persuaded not to bring him to trial. Weiss agreed to cooperate and the next day he met with a government attorney to discuss the involvement of organized crime in the Atlanta nightclub industry. Weiss was not questioned regarding the evidence against him and, after two interviews, the prosecutor concluded that Weiss was not being truthful and discontinued the talks. 599 F.2d at 733–34. As in *Calimano*, the *Weiss* court held that the government never made a firm commitment not to prosecute and, in any event, Weiss was not prejudiced by his revelations. *Id.* at 735, 737–38.

Unlike the situations in *Calimano* and *Weiss*, we are confronted with a case where it is obvious that the state prosecutors made a commitment not to prosecute Rowe. In addition, the defendants in those two cases never revealed information concerning the charges against them and they did not testify for the government. Just the opposite occurred in Rowe's case. Lead to believe that he was immune from prosecution, Rowe testified against the Klansmen at the state murder trials and disclosed information and evidence that is directly related to the prosecution now being taken against him. Without a doubt, the state would not have benefited from Rowe's willing assistance if Rowe had any inkling that he would later be brought to trial on the same charges.

 We note that, under the self-incrimination clause of the fifth amendment, evidence of guilt induced by a government promise of immunity is "coerced" evidence and may not be used against the accused. *Shotwell Manufacturing Co. v. United States*, 371 U.S. 341, 347, 83 S.Ct. 448, 453, 9 L.Ed.2d 950 (1963). For purposes of compelling testimony which otherwise would be privileged by the fifth amendment, all that is constitutionally required is a grant of use immunity. *Kastigar v. United States*, 406 U.S. 441, 458–59, 92 S.Ct. 1653, 1663, 32 L.Ed.2d 212 (1972). However, in order to secure testimony, evidence, or other cooperation from a potential criminal defendant, a prosecutor may see fit to promise complete immunity from prosecution. Although *Weiss* held on its facts that no agreement had been entered into, the case suggests that an analysis of the binding effect of an agreement not to prosecute should consider "whether there was a promise held out to which the government, as a matter of fair conduct, might be bound." 599 F.2d at 738. We believe that, as a matter of fair conduct, the government ought to be required to honor such an agreement when it appears from the record that: (1) an agreement was made; (2) the defendant has performed on his side; and (3) the subsequent prosecution is directly related to offenses in

---

5. *See also United States v. Donahey*, 529 F.2d 831, 832 (5th Cir.), *cert. denied*, 429 U.S. 828, 97 S.Ct. 85, 50 L.Ed.2d 91 (1976), in which the court refused to grant equitable immunity where the defendant testified before a grand jury pursuant to a plea bargaining agreement, but gave misleading and evasive answers.

which the defendant, pursuant to the agreement, either assisted with the investigation or testified for the government.

Analogous precedent in the area of plea bargaining supports our conclusion. A defendant who pleads guilty as a result of a plea bargaining agreement has a due process right to enforcement of the bargain. *Santobello v. New York*, 404 U.S. 257, 262, 92 S.Ct. 495, 498, 30 L.Ed.2d 427 (1971); *United States v. Block*, 660 F.2d 1086, 1089–90 (5th Cir. 1981).

In *Santobello*, the defendant plead guilty after a state prosecutor promised not to make a sentencing recommendation. At sentencing, however, another prosecutor recommended the maximum sentence. 404 U.S. at 258–59, 92 S.Ct. at 496. The Supreme Court reversed the conviction and remanded to the state courts, emphasizing that the state was bound by the prosecutor's promise, regardless of whether the prosecutor's breach was inadvertent or played no part in the trial judge's sentencing decision. *Id.* at 262–63, 92 S.Ct. at 498. The Court's remarks concerning the role of plea bargaining in the criminal justice system are particularly pertinent to our decision:

> This phase of the process of criminal justice, and the adjudicative element inherent in accepting a plea of guilty, must be attended by safeguards to insure the defendant what is reasonably due in the circumstances. Those circumstances will vary, but a constant factor is that when a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled.

*Id.* at 262, 92 S.Ct. at 498.

■ This contractual analysis applies equally well to promises of immunity from prosecution. When such a promise induces a defendant to waive his fifth amendment rights by testifying at the trial of his con-

federates or to otherwise cooperate with the government to his detriment, due process requires that the prosecutor's promise be fulfilled. We hold that once the defendant's good faith compliance with the terms of the agreement is established, the state must perform on its side and any attempt by the state to breach the agreement is *per se* a bad faith prosecution. *Cf. Acosta v. Turner*, 666 F.2d 949, 953 (5th Cir. 1982) (where the defendant stipulated to competency in reliance on a promise of the state trial court, the court must keep its promise).[6]

In this case, Rowe has established that he reached an agreement with the highest law enforcement officers of the State of Alabama pursuant to which he was promised immunity from prosecution in return for his testimony. In reliance on that bargain, Rowe testified for the state in the murder trials of the Klansmen. Rowe has therefore made a *prima facie* showing that he was promised immunity and that he complied in good faith with the terms of the agreement.

The only evidence in the record going to Rowe's lack of good faith is testimony indicating that Rowe perjured himself when he testified before the state grand jury and in the state trials. Such evidence, if credited, would remove from the state any obligation to uphold the promise of immunity. The District Court, however, did not credit this testimony. That determination is subject to the clearly erroneous standard and we are mindful that an appellate court should be especially reluctant to disregard a district court's credibility choices. *Graver Tank & Manufacturing Co. v. Linde Air Products Co.*, 336 U.S. 271, 275, 69 S.Ct. 535, 537, 93 L.Ed. 672 (1949); *United States v. Reddoch*, 467 F.2d 897, 898 (5th Cir. 1972). The discredited testimony was that of Lavone Coleman and Henry Snow. Coleman was a police officer at the time of the murder and Snow became a police officer in

---

6. District Attorney Bryan argues that under *Wilson v. Thompson* Rowe is required to establish improper motivation. *Wilson* established a three-part test for determining whether a state

criminal prosecution is improperly motivated. 593 F.2d at 1386–87. The test is not applicable where bad faith is evident as a matter of law. *See id.* at 1384.

1968. Coleman testified that, the day after the murder, Rowe admitted to shooting a woman in Selma. Snow corroborated Coleman's testimony, saying that he was with Coleman when Rowe made this admission. Both men said that they were aware, at the time, of the Liuzzo murder and of the state and federal trials, yet both men testified that for many years they told no one about this incident. In contrast, Rowe has steadfastly maintained that he did not shoot Mrs. Liuzzo. Under such circumstances, we find no basis to override the determination of the District Court that the testimony of Coleman and Snow was incredible.

We note that Coleman and Snow were called to testify at the District Court's evidentiary hearing by Rowe. District Attorney Bryan indicated that, in addition to Coleman and Snow, he called the two Klansmen and a state trooper to testify before the state grand jury. These witnesses were not called to testify at the evidentiary hearing, nor was any other attempt made to introduce evidence going to Rowe's lack of compliance.[7]

In conclusion, the record lacks any credible evidence that Rowe did not testify fully and truthfully in the state court proceedings or in some other way failed to perform his end of the bargain. Without such a showing, any attempt to prosecute Rowe is, as a matter of law, a bad faith prosecution. On that basis, we affirm the District Court's order granting a permanent injunction.[8] It is unnecessary for us to discuss other issues raised on appeal and we decline to do so.

AFFIRMED.

THORNBERRY, Circuit Judge, specially concurring:

Despite the excellence of Judge Fay's opinion, my understanding of *Younger* abstention compels me to disagree with part of his analysis. While I agree that we should require, "as a matter of fair conduct," the government to adhere to its promise not to prosecute Rowe, I cannot assent to a *per se* adaptation of the bad faith exception to *Younger* abstention.

As the majority explains in its lucid presentation of the facts, District Attorney Bryan was prompted to reopen the Liuzzo case after another district attorney informed him that Rowe had failed a polygraph test indicating that he had fired the shots that killed Mrs. Liuzzo. Believing that Rowe had perjured his testimony in subsequent prosecutions of Ku Klux Klan members, Bryan then obtained a grand jury indictment against Rowe. To support the indictment, Bryan relied on the testimony of Lavone Coleman and Henry Snow, who stated that Rowe admitted on the day after the murder to shooting Mrs. Liuzzo. Bryan also offered the testimony of the two Klansmen whom Rowe helped to convict and the testimony of a state trooper. These men did not testify before the district court, however.

The district court reached its conclusion that District Attorney Bryan acted in bad faith by "investing" in Bryan "the bad faith exhibited by all of the State court witnesses." This inference as a basis for finding bad faith is inadequate, for the possible improper motive of a witness standing alone cannot constitute bad faith on the part of the prosecutor. *See Juidice v. Vail,*

---

**7.** District Attorney Bryan testified that results of a polygraph examination spurred his investigation of the Liuzzo murder. While lie detector tests may be useful for investigation and pretrial disposition of cases, under existing law they are not admissible in evidence and no attempt was made to introduce the results of such tests at the evidentiary hearing. *See United States v. Martino,* 648 F.2d 367, 390 (5th Cir.), *rehearing en banc granted,* (Oct. 13, 1981); *Flurry v. State,* 52 Ala.App. 64, 289 So.2d 632, 643 (1973), *cert. denied,* 289 So.2d 644 (Ala.1974).

**8.** Judge Thornberry would affirm the trial judge's ruling by using the extraordinary circumstances exception of *Younger.* We have traveled a different route under the bad faith exception. Had we not felt such was justified, we certainly would have affirmed the trial court's ruling for those reasons outlined in Judge Thornberry's special concurrence. The trial judge granted relief based upon both theories.

430 U.S. 327, 97 S.Ct. 1211, 1219, 51 L.Ed.2d 376 (1977); *Wilson v. Thompson*, 593 F.2d 1375, 1391 (5th Cir. 1979) (Thornberry, J., specially concurring). Thus, on appeal, we are left with nothing but the fact of prosecution itself, fifteen years after the crime, from which to infer bad faith. This fact is insufficient evidence of bad faith under any prior interpretation of the bad faith exception to *Younger*. *See Wilson, supra*, 593 F.2d at 1381–83, where the court discusses the many forms of conduct which manifest "bad faith."

The difficulty of satisfying traditional constructions of the bad faith exception has led the majority to adopt a *per se* rule, which avoids traditional requirements "as a matter of law." Though this approach appears fair on the facts of this case, the majority rule, like any *per se* doctrine, encompasses cases that are today both unknown and undefinable. Thus, it is inconsistent with the concern for prudential restraint that underlies *Younger* abstention. *See Kolski v. Watkins*, 544 F.2d 762, 764–66 (5th Cir. 1977). For this reason, I regard a *per se* rule as unwise and unnecessary.

Since I cannot concur in the creation of a *per se* doctrine of unforeseeable application, and since evidence of bad faith in this case is inconclusive at best, I would rest our decision on the extraordinary circumstances exception to *Younger*. In *Younger* the Supreme Court held that extraordinary circumstances in the absence of bad faith or harassment might justify equitable relief if the complainant can prove irreparable injury. *Younger v. Harris*, 401 U.S. 37, 54, 91 S.Ct. 746, 755, 27 L.Ed.2d 669 (1971). *See also Kolski, supra*, 544 F.2d at 765. No court has defined "extraordinary circumstances," *see Kugler v. Helfant*, 421 U.S. 117, 126, 95 S.Ct. 1524, 1531, 44 L.Ed.2d 15 (1975), but it is clear that the exception is an independent ground for declining abstention under *Younger*. A court must find that an extraordinarily pressing need for immediate federal equitable relief exists, and that if relief is not granted, irreparable injury to the plaintiff will result. *See Kolski, supra*, 544 F.2d at 765. One instance of extraordinary need noted by the Court in

*Younger* occurs when state authorities attempt to enforce a statute that is "flagrantly and patently violative of express constitutional prohibitions in every clause, sentence and paragraph, and in whatever manner and against whomever an effort might be made to apply it." 401 U.S. at 54–55, 91 S.Ct. at 755. It is the prosecution itself, under such a statute, that violates the Constitution.

Rowe's case is identical in this fundamental sense. He was granted immunity from prosecution for the murder of Mrs. Liuzzo. He complied with his part of the bargain. As the majority explains in its thorough discussion of equitable immunity, fairness forbids the prosecution of Rowe. Under these circumstances, the very bringing of charges against Rowe violates the Fifth and Fourteenth Amendments. For this reason, the need for federal equitable relief to avoid irreparable injury is extraordinarily pressing. Rowe has already lost his job and the secret identity given to him by the government. The real injury to Rowe, however, lies in the future. It would be the loss of the benefit of his bargain—his right not to be prosecuted. Rowe's right to have no charges brought against him would be lost irretrievably if we permit the state prosecution to proceed. His past cooperation with federal and state authorities would have been to no avail, and our grant of equitable immunity would be meaningless. The damage to Rowe thus equals much more than "the cost, anxiety, and inconvenience of having to defend against a single criminal prosecution." *Younger, supra*, 401 U.S. at 46, 91 S.Ct. at 751.

I have no difficulty finding extraordinary circumstances in the facts of this case, such as to justify affirming the district court's grant of equitable relief. I, therefore, concur in the judgment rendered by the majority, though I differ with its analysis for the foregoing reasons.