**UNITED STATES of America, Plaintiff-Appellant,**

v.

**Jerry Lee HARVEY, Defendant-Appellee.**

No. 87–5051.

United States Court of Appeals, Eleventh Circuit.

July 14, 1988.

Dexter W. Lehtinen, U.S. Atty., Miami, Fla., Thomas L. Fink, Sp. Atty., U.S. Dept. of Justice, Roger M. Olsen, Asst. Atty. Gen., Tax Div., U.S. Dept. of Justice, Gary R. Allen, Chief, Appellate Section, Robert E. Lindsay, Alan Hechtkopf, Washington, D.C., for plaintiff-appellant.

Leonard Alan Sands, Coconut Grove, Fla., for defendant-appellee.

Before KRAVITCH and CLARK, Circuit Judges, and ESCHBACH *, Senior Circuit Judge.

---

* Honorable Jesse E. Eschbach, Senior U.S. Circuit Judge for the Seventh Circuit, sitting by designation.

ESCHBACH, Senior Circuit Judge:

The United States appeals the dismissal of an indictment charging appellee with income tax evasion and filing a false income tax return. The district court dismissed the indictment on the ground that it violated the government's grants of transactional and use immunity to the appellee in a prior drug case. We affirm.

## I

On November 27, 1985, a grand jury in the Southern District of Florida returned an indictment charging the appellee, Jerry Lee Harvey, with five counts of income tax evasion for the years 1978 through 1982, in violation of 26 U.S.C. § 7201, and one count of filing a false income tax return in April of 1981, in violation of 26 U.S.C. § 7206(1). Essentially, the government maintains that Harvey failed to report substantial interest income earned on funds deposited in bank accounts in the Cayman Islands, and that Harvey's 1980 tax return falsely represented that he had no foreign bank accounts.

On June 2, 1986, Harvey filed a motion for a pretrial *Kastigar* hearing,[1] in which he alleged that in 1980 the government had informally granted him use immunity in return for his cooperation in a drug investigation. The motion requested that the court require the government to reveal all of its evidence supporting the tax indictment and to demonstrate that the evidence was derived from sources independent of the information Harvey had revealed to the government pursuant to the 1980 plea agreement. In support of his allegation that he had been granted use immunity, Harvey submitted a letter written by the United States Attorney for the Southern District of Alabama, indicating that Harvey and the government had reached a plea agreement in 1980. The terms of the agreement, however, were not clear from the letter. The government objected to holding a *Kastigar* hearing on the ground that Harvey had not demonstrated that he actually had been granted use immunity in 1980, and thus, a *Kastigar* hearing would be premature at that time. Given the ambiguities surrounding the unwritten plea agreement, the magistrate did not hold a traditional *Kastigar* hearing, as Harvey had requested. Instead, she held a series of "pre-*Kastigar*" hearings in order to determine (1) whether Harvey had been granted immunity in 1980, (2) if so, what kind of immunity had been granted, and (3) what information Harvey had revealed to the government.[2]

The pre-*Kastigar* hearings revealed the following facts. On June 13, 1980, Harvey was arrested in Mobile, Alabama in connection with the attempted importation of a large quantity of quaalude tablets. He and others were later indicted in the Southern District of Alabama for federal drug offenses. Because the case against Harvey was strong, his attorney advised him to cooperate with the government and attempt to negotiate a deal with respect to the pending charges. Although the United States Attorney did not need Harvey's testimony or cooperation in the Mobile case, the United States Attorney's Office for the Southern District of Florida desired his cooperation in connection with investigations in its district. Accordingly, Harvey and the government reached an agreement, and in September of 1980, DEA agents from the Southern District of Florida interrogated Harvey in a hotel room in Mobile. Harvey's name eventually was dropped from the Mobile indictment.

By a glaring act of omission, the government lawyers for the Southern Districts of Alabama and Florida never reduced the agreement with Harvey to writing. More-

---

**1.** A *Kastigar* hearing is triggered once a defendant establishes that he provided the government with information or testimony under a grant of immunity. It gives the government an opportunity to prove that the evidence it wishes to adduce at trial is derived from a legitimate source wholly independent of the compelled testimony or the information the defendant disclosed under the immunity grant. *Kastigar v.* *United States,* 406 U.S. 441, 460–62, 92 S.Ct. 1653, 1665, 32 L.Ed.2d 212 (1972).

**2.** Magistrate Vitunac apparently chose the "pre-Kastigar" label because the purpose of the proceeding was to enable her to determine if *Kastigar* hearing was called for.

over, the DEA agents responsible for debriefing Harvey failed to make any written reports or keep any notes detailing the information that Harvey revealed to them in 1980. Consequently, the magistrate was left with the difficult task of trying to piece together, from over fifteen hours of conflicting testimony from numerous witnesses, the terms of the plea agreement what representation the government made to Harvey, and what Harvey told the government pursuant to the agreement. After carefully reviewing the record, Magistrate Vitunac concluded that the plea agreement had granted Harvey both transactional and use immunity for any information or transactions that he had revealed to the DEA agents in 1980. Furthermore, the magistrate found that Harvey had told the DEA agents about all of the drug deals in which he had been involved prior to and at the time of his arrest in 1980 and had also "divulged ... his financial dealings with respect to his illegal drug deals." This information included the identification of the funds in the Cayman Islands bank.

To determine the legal effect of these findings upon the pending indictment against Harvey, Magistrate Vitunac next reviewed the testimony of Stephen Snyder, the prosecutor who investigated the tax case against Harvey and presented it to the grand jury. According to Snyder, the government used the net worth method of proof, corroborated by specific items of unreported income, to establish that Harvey had failed to report income. Snyder testified that he advised the grand jury that the likely source of Harvey's income was narcotics trafficking and that the largest increase in his net worth occurred in 1978 and 1979 when he deposited large amounts of money in bank accounts in the Cayman Islands. The corroborating specific items of unreported income presented to the grand jury were amounts of interest income earned in the years 1980 through 1982 on certificates of deposit issued by the Bank of Nova Scotia in the Cayman Islands.

The magistrate decided that the information concerning Harvey's drug activities and related financial dealings formed the basis for the tax indictment and was "inextricably tied" to the information that Harvey had revealed to the DEA agents in 1980. Thus, the magistrate concluded that the indictment violated the grants of immunity extended to Harvey and recommended that the district court dismiss the indictment.

District Judge Paine agreed with the magistrate's factual finding that the government had extended both use and transactional immunity to the appellee. He also agreed with the magistrate's legal conclusion that the indictment violated those grants of immunity. Refusing the government's request to prove that its evidence was derived from independent sources, the district court dismissed the indictment against Harvey, 651 F.Supp. 894. The government now appeals the dismissal of Counts three through six of the indictment, which charge the appellee with tax evasion for the years 1980 through 1982 and filing a false income tax return in April of 1981.

II

The government does not take issue with the district court's finding of fact that under the terms of the plea agreement, appellee Harvey was granted both transactional immunity and use immunity. Nevertheless, it maintains that as a matter of law Harvey cannot be insulated from indictment for crimes he allegedly committed after that bargain was struck. We do not disagree with the general parameters of the government's analysis of the law pertaining to transactional and use immunity and the scope of immunity that can be afforded by statutory and informal written grants of immunity. Were we interpreting a written plea agreement incorporating an express grant of immunity, the government's position might well prevail. However, because of the most unusual circumstances of this case, we are obliged to conclude that the traditional law pertaining to transactional and use immunity is inapposite and does not control the disposition of the government's appeal.

We deal here with an informal (non-statutory), unwritten grant of immunity that arose as part of an unwritten plea agreement which provided the basis for the government's dismissal of a criminal indictment against appellee in exchange for his willingness to furnish information as to illegal drug and related activities. Our analysis is further complicated by the fact that the government agents who interviewed Harvey pursuant to the unwritten plea agreement either failed to make any written notes, or at least failed to retain those notes, and prepared no report documenting the substance and scope of the information Harvey provided.

Thus, we have no way of discerning the precise parameters of the immunity the government promised to Harvey. Appellee's assertion regarding his understanding of the scope of immunity granted him orally is supported by the findings of the magistrate. A careful examination of the case law relied upon by the government reveals that none of those opinions address circumstances involving an unwritten grant of immunity of uncertain type and scope. Thus, the government's attempt to solve the dilemma created by its inexplicable acts of omission by applying precedent is misdirected because there simply is no precedent applicable to the bizarre situation presented by this case.

On the basis of the evidence adduced at the "pre-*Kastigar*" hearing conducted before her, Magistrate Vitunac found, and District Judge Paine agreed, that the government had granted appellee both use immunity and transactional immunity in exchange for the information he could provide. Given the nature of the evidence presented at the "pre-*Kastigar*" hearing, Magistrate Vitunac simply had no other choice but to infer that both types of immunity had been promised to Harvey.

The magistrate also found that in exchange for the government's promises of use and transactional immunity, Harvey told the government agents about all of his drug dealings prior to his 1980 arrest and also divulged his financial dealings with regard to those illegal drug transactions. The information disclosed to the government by appellee included reference to the deposits he had made in the Cayman Islands bank. The government now claims that the district court erred because the indictment against Harvey was dismissed even though it was not given the opportunity, in a *Kastigar* hearing, to demonstrate that the evidence it would present at trial was obtained from sources independent of the information disclosed by appellee.

■ The government's argument misses one critical point. Harvey was granted both use and transactional immunity with regard to all matters he disclosed to the government. Transactional immunity shields an individual from prosecution for any matters disclosed under that grant of immunity. *See Rowe v. Griffin,* 676 F.2d 524, 526 (11th Cir.1982); *United States v. Weiss,*[3] 599 F.2d 730, 737, n. 14 (5th Cir. 1979), *United States v. Quatermain,* 613 F.2d 38, 40 (3d Cir.1980). *See also Kastigar v. United States,* 406 U.S. 441, 453, 92 S.Ct. 1653, 1661, 32 L.Ed.2d 212 (1972). That the government might have been able to secure information pertaining to those same matters from a different, independent source has no significance in a situation in which transactional immunity has been granted.

■ By its very nature a *Kastigar* hearing would go only to the question of whether the government breached the promise of use immunity it made to Harvey.[4] Because it is limited to matters concerned with use immunity, the *Kastigar* hearing the

---

**3.** The Eleventh Circuit, in the en banc decision *Bonner v. City of Pritchard,* 661 F.2d 1206 (11th Cir.1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

**4.** In *Kastigar, supra,* the Supreme Court was confronted with the question of the constitutionality of the use immunity protection granted

witnesses who are compelled to testify in federal court trials by 18 U.S.C. § 6002. Thus, it is clear that the type of hearing directed by the Court in *Kastigar* is not called for when, as in this case, a defendant is determined to have been granted transactional immunity that shields him absolutely from prosecution.

government seeks would have no effect on the grant of transactional immunity Harvey was accorded with regard to the funds he holds in the Cayman Islands bank. This is so because the government had effectively agreed not to prosecute appellee with regard to those funds. *See Quatermain*, 613 F.2d at 45 (Aldisert, J., dissenting) (characterizing informal grants of immunity as "discretionary agreements not to prosecute").

■ In *Santobello v. New York*, 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971) the Supreme Court made clear that included among the safeguards it considers necessary to guarantee the fairness of the plea bargaining process is a requirement that prosecutors honor the bargains they make with defendants. Thus, the Court stated: "a constant factor is that when a plea rests in any significant degree on a promise or agreement by the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled." 404 U.S. at 262, 92 S.Ct. at 498. Our Court has stated its intention to "follow[ ] the principles enunciated in *Santobello* by requiring that the government adhere strictly to the terms of plea agreements." *In re Arnett*, 804 F.2d 1200, 1204 (11th Cir.1986) (referring to *Santobello, supra*) (citing *United States v. Avery*, 621 F.2d 214, 216 (5th Cir.1980), *cert. denied*, 450 U.S. 933, 101 S.Ct. 1396, 67 L.Ed.2d 367 (1981) and *United States v. Shanahan*, 574 F.2d 1228 (5th Cir.1978)).

Therefore, since the government had effectively promised Harvey it would not prosecute him with regard to the Cayman Islands funds, proof on its part that the prosecution it seeks to pursue would be based on evidence derived from sources independent of the information Harvey provided would be of no consequence. The government promised Harvey it would not prosecute him and it must honor that promise. The district court did not err in refusing the government's request for a *Kastigar* hearing.

### III

■ In general, the scope of an enforceable grant of immunity, exchanged either for compelled or voluntary testimony, or for information supplied, extends only to crimes a person has already committed or is in the process of committing. The case law leaves little room for the contention that even a negotiated, non-statutory grant of transactional immunity can shield an "immunee" from prosecution for his future illegal acts. *See Counselman v. Hitchcock*, 142 U.S. 547, 562, 12 S.Ct. 195, 198, 35 L.Ed. 1110 (1892); *United States v. Freed*, 401 U.S. 601, 606–07, 91 S.Ct. 1112, 1117, 28 L.Ed.2d 356 (1971); *Quatermain*, 613 F.2d at 42–43; *Rule v. United States*, 362 F.2d 215, 217 (5th Cir.1966). *Cf. Marchetti v. United States*, 390 U.S. 39, 53, 88 S.Ct. 697, 705–06, 19 L.Ed.2d 889 (1968) (holding that the fifth amendment privilege against self-incrimination provided a complete defense to the prosecution of a defendant based on his refusal to comply with a federal statute when that compliance would have subjected him to a substantial and real threat of incrimination in the future).

■ The general rule of law regarding immunity for future illegal acts notwithstanding, the fact remains that the unwritten transactional immunity agreement the government consummated with Harvey may well have been couched in terms that appeared to Harvey to insulate all matters which he revealed, including the monies he then had on deposit in the Cayman Islands bank. That such a grant of perpetual transactional immunity may not have been enforceable is beside the point here. Harvey, perhaps misunderstanding the oral immunity discussions, performed his end of the agreement. If the government left him with the impression that all matters he revealed would be forever immune from prosecution, it cannot now, at least in the context of this prosecution, be permitted to renege on that promise. *See Rowe*, 676 F.2d at 527–28 (holding that an individual who had provided grand jury testimony after being assured of immunity from prosecution was entitled to judicial enforcement of that promise not to prosecute). *See also Weiss*, 599 F.2d at 737 (citing *Santobello*,

404 U.S. at 262, 92 S.Ct. at 498). *Cf. United States v. Abou-Saada*, 785 F.2d 1, 7 (1st Cir.1986) (finding no "basic unfairness" in violation of due process in the government's use of evidence pertaining to a defendant's conduct when that conduct was not proven to have resulted from a promise by the government not to prosecute and where there was no proof that defendant relied on such a promise); *United States v. Fountain*, 776 F.2d 878, 884 (10th Cir.1985) (affirming a district court holding that a defendant who did not perform on his obligation under an immunity grant was not entitled to immunity).

The government's inability to discredit the more expansive reading of the immunity grant advocated by Harvey is a direct result of the gross neglect of its officials in failing to memorialize that grant of immunity, or the agreement underlying the grant, in written form. Those government officials may or may not have misled Harvey as to the scope of the immunity offered him. Because there is no written document or any other reliable evidence to which the Court can turn, we cannot ascertain what bargain was struck by appellee and the government. Nevertheless, because the government's acts of omission have created this predicament, we believe due process considerations require that the defendant/appellee not be made to suffer. *See Rowe*, 676 F.2d at 526 n. 4 (citing *Santobello*, 404 U.S. at 262, 92 S.Ct. at 498).

Although we do not adopt the precise terminology employed in *Rowe, supra*, we note the consistency of our analysis with Judge Fay's discussion in that opinion of the concept of "equitable immunity." In *Rowe* an assistant state attorney general had made a commitment not to prosecute defendant/appellee Rowe in exchange for his willingness to provide information regarding a notorious murder. Thirteen years later new information persuaded a local district attorney to present a case to a county grand jury seeking an indictment of Rowe for the murder. That indictment was returned by the grand jury and Rowe subsequently secured an injunction from the federal district court to halt his prosecution in state court.

Proceeding under the "bad faith" exception to the abstention doctrine of *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), the Court in *Rowe* affirmed the district court's injunction of the pending state court prosecution. In doing so, the Court observed that when a promise of immunity from prosecution:

> induces a defendant to waive his fifth amendment rights by testifying at the trial of his confederates or to otherwise cooperate with the government to his detriment, due process requires that the prosecutor's promise be fulfilled. We hold that once the defendant's good faith compliance with the terms of the agreement is established, the state must perform on its side and any attempt by the state to breach the agreement is *per se* a bad faith prosecution.

*Rowe*, 676 F.2d at 528. In applying the concept of equitable immunity, the *Rowe* Court held that:

> as a matter of fair conduct, the government ought to be required to honor [an agreement granting transactional immunity to an informant] when it appears from the record that: (1) an agreement was made; (2) the defendant has performed on his side; and (3) the subsequent prosecution is directly related to offenses in which the defendant, pursuant to the agreement, either assisted with the investigation or testified for the government.

*Id.* at 527–28.

We are not presented with an attempt by an accused to block a state court prosecution. Therefore, the *Younger* doctrine and the "bad faith" exception to it are inapposite here. For that reason and because of other differences in the fact situation of our case, we are reluctant to expressly adopt the three-part test of *Rowe* as controlling here. Nevertheless, the analysis and the result in *Rowe* do indicate that the outcome we reach is the proper one and we cite both with approval. *See Weiss*, 599 at 735 n. 9.

A second alternative analytical approach to the circumstances presented by this case

is suggested by the dissenting opinion of Judge Aldisert in *Quatermain, supra.* That case involved an ambiguous, written grant of immunity of uncertain scope exchanged by the government for Quatermain's willingness to testify against an associate of his. Characterizing the case as an "odd mix of civil contract and estoppel law thrust into the context of a criminal prosecution" Judge Aldisert chose to view the bargain between Quatermain and the government as a "discretionary agreement not to prosecute." *Quatermain,* 613 F.2d at 45. He impliedly rejected the majority's conclusion that the scope of the immunity Quatermain could properly claim was limited by the relevant law pertaining to the scope of the fifth amendment protection against self-incrimination. *See Counselman,* 142 U.S. at 562, 12 S.Ct. at 198; *Marchetti,* 390 U.S. at 53, 88 S.Ct. at 705–06; *Freed,* 401 U.S. at 606–07, 91 S.Ct. at 1117; *Kastigar,* 406 U.S. at 453, 92 S.Ct. at 1661. Instead, Judge Aldisert would have enforced the terms of the agreement not to prosecute which he believed the government had entered into with Quatermain. His dissent concludes with the following observations.

> While recognizing that in entering into these agreements the government is not negotiating with Sunday School teachers and that the negotiations may be, if not loathsome, at least unpleasant experiences, it seems to me a clearer understanding of the bargain than that presented by the facts of this case should be the *sine qua non* of any such undertaking. Conditions describing the extent of [a] no-prosecution [agreement] should be set forth with maximum specificity. The courts should put a premium on such specificity and impose a penalty on generality. ... the burden of proving the limitations of the no-prosecution provisions of the agreement should be on the government and ambiguities resolved against it, as they would be against the drafter of any written instrument."

*Id.* at 46–47.

Unlike the defendant in *Quatermain,* Harvey was represented by counsel during the negotiations that resulted in his being granted immunity from prosecution. Nevertheless, we believe that the emphasis Judge Aldisert's dissent places upon the importance of specificity in no-prosecution agreements, the obligation of the government to insure that requisite specificity is achieved, and the propriety of resolving doubts as to the terms of an ambiguous or indiscernible immunity grant against the government is well-placed and consistent with the approach we take here.

Whatever label is applied to the analytical paradigm used, the principle is the same. The government has an obligation to clearly define the parameters of any grant of immunity it extends to a person who in exchange agrees to provide information or testimony the government desires. Once that person has performed his/her end of the bargain, the government must be held to its promises. Fundamental fairness commands that any uncertainty as to exactly what the government promised the informant or witness cannot be permitted to work in the government's favor.

## IV

It is clear that even if the government actually did grant Harvey transactional immunity intended to insulate him forever from any prosecution related to the interest earned from the Cayman Islands funds, that component of the 1980 immunity grant would be unenforceable. *See Freed,* 401 U.S. at 606–07, 92 S.Ct. at 1117; *Quatermain,* 613 F.2d at 42–43; *Rule,* 362 F.2d at 217. We do not maintain that appellee, or any other defendant, may under any circumstances enjoy perpetual immunity from prosecution for failure to report and/or pay taxes on future interest income realized from bank accounts or other income producing instruments whose existence and location are disclosed in the course of fulfilling his commitments under an informal plea agreement/grant of immunity. However, at a minimum the government had an obligation, when Harvey disclosed the existence and location of the Cayman Islands interest-bearing accounts, to point out that his immunity did not extend to future interest payments derived from those accounts

or otherwise to alert Harvey as to the bounds of the immunity granted. It failed to do so.

The government never directly told Harvey, or gave him reason to infer, that the scope of the immunity he was being granted did not extend to the income tax obligations that would accrue on any future interest he realized from the monies which he disclosed were deposited in the Cayman Islands bank. However, it can be fairly said that the return of the grand jury indictment against Harvey on November 25, 1985 charging him with income tax evasion and filing a false income tax return was sufficient to put appellee on clear notice that from that day forward he was not insulated from future prosecution for failure to report, and pay federal income taxes on, the Cayman Islands interest income accruing thereafter. However, because Harvey had not been unequivocally and authoritatively informed of the limitations of the immunity grant that he attained from the government in 1980 before November, 1985, it would be a violation of due process to permit his prosecution for income tax-related offenses related to the Cayman Islands funds that occurred prior to the tax year 1985. Because the indictment at issue charges crimes that occurred before the tax year 1985 the district court did not err when it determined that dismissal of the indictment was warranted.[5]

## V

The point of our holding is a simple one. When the government by its conduct, here grossly negligent conduct, has created the situation leading to misunderstandings regarding the nature of a plea agreement and the scope of immunity granted, the fair play dictated by due process requires nothing less than that the doubts as to either be resolved in favor of the individual misled. *Rowe*, 676 F.2d at 528 n. 4 (citing *Santobello*, 404 U.S. at 262, 92 S.Ct. at 498). *See also Quatermain*, 613 F.2d at 46–47 (Aldisert, J., dissenting). Accordingly, the judgment of the district court is AFFIRMED.

KRAVITCH, Circuit Judge dissenting:

Respectfully, I dissent. The majority holds that Harvey is free from prosecution for crimes he allegedly committed after an unwritten agreement not to prosecute him was reached in September of 1980. The majority's rationale is that because the government neglected to reduce the agreement to writing, thus creating confusion as to its exact parameters, it had an obligation, as part of due process, to warn Harvey that the agreement did not protect him from prosecution for future crimes.[1] Conceding that the government lacks the power to grant a defendant immunity from prosecution for future crimes,[2] the majority nevertheless holds, in effect, that this limitation is not operative until the government warns a defendant that it does not possess such authority. The notion that due process requires the government to warn a defendant of the obvious—that an agreement not to prosecute or a grant of immunity does not give the defendant carte blanche to continue committing related crimes with impunity—is untenable. I can-

---

**5.** Harvey remains subject to prosecution for any income tax-related or other offenses pertaining to the Cayman Islands funds that arose from his actions or acts of omission during the year 1985 and thereafter.

**1.** More precisely, according to the majority "the government had an obligation, when Harvey disclosed the existence and location of the Cayman Island interest-bearing accounts, to point out that his immunity did not extend to future interest payments derived from those accounts...."

**2.** The majority states that "[i]t is clear that even if the government actually did grant Harvey transactional immunity intended to insulate

him forever from any prosecution related to the interest earned from the Cayman Islands funds, that component of the 1980 immunity grant would be unenforceable. We do not maintain that appellee, or any defendant, may under any circumstance enjoy perpetual immunity from prosecution for failure to report and/or pay taxes on future interest income realized from bank accounts or other income producing instruments whose existence and location are disclosed in the course of fulfilling his commitments under an informal plea agreement/grant of immunity." (citations omitted).

not endorse such an unprecedented [3] extension of due process.

Despite my disagreement with the majority's holding in this case, I share its consternation with the government's failure to reduce to writing the 1980 agreement, and I agree that the government must suffer certain consequences as a result of its oversight. Thus, I concede that although the government may have intended to grant Harvey immunity from prosecution only in the Mobile drug case,[4] the magistrate was not clearly erroneous in finding that the agreement granted transactional and use immunity for any and all information or transactions that Harvey had revealed to the DEA agents in 1980, including information about his illegal drug and financial transactions in Florida and the Cayman Islands. Based on this factual finding, I agree that Harvey is immune from prosecution for any related drug or financial crimes committed before September of 1980, and that the first two counts of the indictment were properly dismissed.[5] However, despite the magistrate's finding that the agreement conferred both transactional and use immunity on Harvey, the dismissal of the remaining counts of the indictment, which charged Harvey with crimes allegedly committed after 1980, was improper.

Transactional immunity "accords full immunity from prosecution for the offense to which the compelled testimony relates." *Kastigar v. United States,* 406 U.S. 441, 453, 92 S.Ct. 1653, 1661, 32 L.Ed.2d 212 (1972). Although federal law no longer provides for formal, statutory grants of transactional immunity,[6] a prosecutor may, as in this case, informally grant transactional immunity to a witness in return for his cooperation in a criminal case. *See* 1 W. LaFave & J. Israel, *Criminal Procedure,* § 8.11(d) (1984). Use immunity prohibits the use of compelled testimony, or any evidence derived directly or indirectly from that testimony, against the witness in a criminal prosecution. *See* 18 U.S.C. § 6002. In contrast to transactional immunity, use immunity does not prohibit the government from prosecuting the witness for crimes about which he testified, provided the government proves that it has other evidence to support the prosecution that "is derived from a legitimate source wholly independent of the compelled testimony." *Kastigar,* 406 U.S. at 460, 92 S.Ct. at 1665. Pursuant to 18 U.S.C. §§ 6002, 6003, a district court may formally grant use immunity to a witness who refuses to testify on the basis of his fifth amendment privilege, or, as here, a prosecutor may informally grant use immunity to a witness in return for his cooperation in a criminal case. *See* 1 W. LaFave & J. Israel, *supra,* § 8.11(d).

---

3. None of the cases cited in the majority opinion support the proposition that due process requires the government to warn a defendant that immunity does not extend to crimes the defendant may commit in the future. At best, the majority convinces me that due process requires the government to adhere to the terms of any plea bargains it makes. *See Santobello v. New York,* 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971); *Rowe v. Griffin,* 676 F.2d 524 (11th Cir.1982). However, I fail to see how this proposition even remotely supports the majority's holding that the government must warn a defendant that immunity does not extend to future crimes.

4. The DEA agents testified to this effect at the "pre-*Kastigar*" hearing.

5. The district court was correct in dismissing counts one and two of the indictment, which charged Harvey with income tax evasion for 1978 and 1979, as the grant of transactional immunity undoubtedly accorded Harvey full immunity from prosecution for any past trans-

actions to which his compelled testimony related. When Harvey spoke to the DEA agents in 1980 he had allegedly already committed the offenses charged in counts one and two of the indictment. Furthermore, Harvey's disclosures of the existence of his foreign bank accounts and his past involvement in money laundering schemes were related to the tax offenses charged in the first two counts of the indictment.

6. Transactional immunity statutes typically provided that "no person shall be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter or thing, concerning which he may testify, or produce evidence, documentary or otherwise ..." *Kastigar v. United States,* 406 U.S. 441, 451, 92 S.Ct. 1653, 1660, 32 L.Ed.2d 212 (1972) (quoting from Compulsory Testimony Act of 1893, which served as a model for numerous federal immunity statutes).

The purpose of a grant of either transactional or use immunity is to preclude a witness' reliance on his fifth amendment privilege against compelled self-incrimination. *See Kastigar v. United States*, 406 U.S. 441, 449, 92 S.Ct. 1653, 1659, 32 L.Ed. 2d 212 (1972); *Counselman v. Hitchcock*, 142 U.S. 547, 564, 586–87, 12 S.Ct. 195, 198, 206, 35 L.Ed. 1110 (1892); 1 W. LaFave & J. Israel, *supra*, § 8.11(a), at 684. As such, in deciding the scope or constitutionality of immunity grants, the Supreme Court traditionally has referred to the scope of the fifth amendment privilege itself. For example, in *Heike v. United States*, 227 U.S. 131, 33 S.Ct. 226, 57 L.Ed. 450 (1913) (Holmes, J.), the Court refused to construe broadly a transactional immunity statute,[7] seeing "no reason for supposing that the act offered a gratuity to crime." *Id.* at 142, 33 S.Ct. at 228. Instead, according to the Court, a grant of immunity "should be construed, so far as its words fairly allow the construction, as coterminous with what otherwise would have been the privilege of the person concerned." *Id.*, 33 S.Ct. at 228.[8] *See also Shapiro v. United States*, 335 U.S. 1, 19, 68 S.Ct. 1375, 1385, 92 L.Ed. 1787 (1948) (following rule of construction of *Heike*). More recently, in *Kastigar*, the Court upheld the constitutionality of 18 U.S.C. § 6002 on the ground that use immunity "is coextensive with the scope of the privilege against self-incrimination, and therefore is sufficient to compel testimony over a claim of the privilege." 406 U.S. at 453, 92 S.Ct. at 1661. Thus, in order to determine the scope of both immunity grants in this case, we must look to the scope of the fifth amendment privilege.[9]

In general, the privilege against self-incrimination only prohibits compelled testimony that might incriminate a witness for crimes he had already committed, or was in the process of committing, at the time the testimony was given. *See Counselman*, 142 U.S. at 562, 12 S.Ct. at 198 (purpose of privilege is "to insure that a person should not be compelled, when acting as a witness in any investigation, to give testimony which might tend to show that he himself *had committed* a crime") (emphasis added); *United States v. Quatermain*, 613 F.2d 38, 42 (3d Cir.), *cert. denied*, 446 U.S. 954, 100 S.Ct. 2923, 64 L.Ed.2d 812 (1980); *Rule v. United States*, 362 F.2d 215, 217 (5th Cir.1966), *cert. denied*, 385 U.S. 1018, 87 S.Ct. 744, 17 L.Ed.2d 554 (1967); *United States v. Phipps*, 600 F.Supp. 830, 831 (D.Md.1985).

In *Marchetti v. United States*, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968), however, the Supreme Court held that the fifth amendment privilege was not entirely inapplicable to prospective acts. The petitioner in *Marchetti* was convicted of violating provisions of a statute that required professional gamblers to register annually with the Internal Revenue Service and pay an occupational tax. The Court held that the petitioner's assertion of his fifth amendment privilege in refusing to comply with the statute provided a complete defense to his prosecution for failing to register and pay the occupational tax. In so holding, the Court explicitly rejected the notion that the fifth amendment privilege offers protection only as to past and

---

**7.** The statute provided that "no person shall be prosecuted or be subjected to any penalty or forfeiture for or on account of any transaction, matter, or thing concerning which he may testify or produce evidence, documentary or otherwise, in any proceeding, suit, or prosecution under [the interstate commerce and anti-trust acts]." *Heike*, 227 U.S. at 141, 33 S.Ct. at 227.

**8.** In *Kastigar v. United States*, 406 U.S. at 453, 92 S.Ct. at 1661, 32 L.Ed.2d 212, the Court noted that transactional immunity, by specifically providing for full immunity from prosecution, is broader than the fifth amendment privilege, which "has never been construed to mean that one who invokes it cannot subsequently be pros-

ecuted." The Court has never indicated that transactional immunity is in any other respect broader than the fifth amendment privilege.

**9.** Although *Heike, Shapiro,* and *Kastigar* all interpreted formal, statutory grants of immunity, the rationale underlying those decisions is also applicable to informal grants of immunity, as both formal and informal grants of immunity serve to supplant a witness' fifth amendment privilege against self-incrimination. *See United States v. Quatermain*, 613 F.2d 38, 41 (3d Cir.) (scope of informal grant of use immunity determined in reference to fifth amendment privilege), *cert. denied*, 446 U.S. 954, 100 S.Ct. 2923, 64 L.Ed.2d 812 (1980).

present acts, *id.* at 53, 88 S.Ct. at 705,[10] and emphasized that "[t]he central standard for the privilege's application has been whether the claimant is confronted by substantial and 'real,' and not merely trifling or imaginary, hazards of incrimination," *id.*, 88 S.Ct. at 705. Relying on this standard, the Court held that the hazards of incrimination created by the registration and occupational tax provisions as to future acts were not "trifling or imaginary" because prospective registrants could reasonably expect that compliance with these provisions "may serve as decisive evidence that they have in fact subsequently violated state gambling prohibitions." *Id.*, 88 S.Ct. at 706. Although application of this standard proved favorable to the petitioner in *Marchetti*, the Court stressed that this would not usually be the case, as prospective acts "will doubtless ordinarily involve only speculative and insubstantial risks of incrimination." *Id.* at 54, 88 S.Ct. at 705. Thus, *Marchetti* created a very narrow exception to the general rule that the fifth amendment privilege applies only to past and present acts.

In *United States v. Freed*, 401 U.S. 601, 91 S.Ct. 1112, 28 L.Ed.2d 356 (1971), the Court emphasized the narrowness of the fifth amendment privilege's application to future conduct. In *Freed*, the Court rejected the argument that a registration requirement of the National Firearms Act violated the fifth amendment because the information disclosed could be used in connection with offenses that the transferee of the firearm might commit in the future. In so doing, the Court stated:

> Appellees' argument assumes the existence of a periphery of the Self-Incrimination Clause which protects a person against incrimination not only against

past or present transgressions but which supplies insulation for a career of crime about to be launched. We cannot give the Self-Incrimination Clause such an expansive interpretation.

*Id.* at 606–07, 91 S.Ct. at 1117.

Lower court opinions also make clear that the fifth amendment privilege rarely will apply to future conduct. For example, in *United States v. Quatermain*, 613 F.2d 38, 42–43 (3d Cir.), *cert. denied*, 446 U.S. 954, 100 S.Ct. 2923, 64 L.Ed.2d 812 (1980), the court noted that *Marchetti* did not support the defendant's argument that the fifth amendment privilege applies to a witness who refuses to testify because he asserts that his testimony somehow may be used to incriminate him in a prosecution for a different type of criminal act that he may commit in the future. Accordingly, the court held that the defendant's testimony under an informal grant of use immunity about his involvement in a drug ring did not prevent the government from indicting him for subsequently manufacturing a gun silencer, even though the district court found that the defendant's immunized testimony had helped lead to the indictment on the gun charge. *See also United States v. Phipps*, 600 F.Supp. 830, 832 (D.Md.1985) (testimony under use immunity grant about involvement in drug conspiracy does not prohibit indictment for subsequently threatening witness who planned to testify against members of conspiracy).

The present case also is distinguishable from *Marchetti* and does not fit within the narrow exception where the privilege against self-incrimination permits a witness to refuse to testify because of the possibility that such testimony will incriminate him concerning future criminal conduct. The statute in *Marchetti* required the petition-

---

10. *Marchetti* overruled *United States v. Kahriger*, 345 U.S. 22, 73 S.Ct. 510, 64 L.Ed.2d 754 (1953), which held that the same provisions of the tax statute at issue in *Marchetti* did not violate the privilege against compelled self-incrimination because "that privilege has relation only to past and present acts, not to future acts that may or may not be committed." 345 U.S. at 32, 73 S.Ct. at 515.

*Marchetti* also overruled *Lewis v. United States*, 348 U.S. 419, 75 S.Ct. 415, 97 L.Ed. 475

(1955), which held that the wagering tax provisions did not violate the fifth amendment privilege because they were not compulsory. According to the *Lewis* Court, "[t]he only compulsion under the Act is that requiring the decision which would-be gamblers must make at the threshold. They may have to give up gambling, but there is no constitutional right to gamble. If they elect to wager, though it be unlawful, they must pay the tax." 348 U.S. at 422–23, 75 S.Ct. at 418.

er, a professional gambler, to either admit that he had broken gambling laws and intended to continue doing so, or risk prosecution for tax avoidance. As pointed out earlier, the *Marchetti* Court intimated that revealing the required information would practically amount to an admission of guilt in a prosecution for a future violation of the gambling laws. *See* 390 U.S. at 54, 88 S.Ct. at 706. Given this, it is not surprising that the Court concluded that the hazards of incrimination created by the statute, even as to future acts, were "substantial and real," and "not merely trifling or imaginary." *Id.* at 53, 88 S.Ct. at 705.

In contrast, the information that Harvey revealed to the DEA agents in September of 1980 could not have created substantial and real hazards that it would incriminate him for tax crimes he allegedly subsequently committed in April of 1981, 1982 and 1983.[11] According to his testimony at the pre-*Kastigar* hearing, Harvey had revealed to the DEA agents that he had deposited millions of dollars, earned through illegal drug transactions, into his accounts at the Nova Scotia Bank in the Cayman Islands. He also told the agents how he set up corporations in the Cayman Islands to launder drug money. In September of 1980, the defendant could not have had "substantial and real" fears that this information would incriminate him for evasion of taxes on interest income that either was not yet required to be reported[12] or had not yet been earned, or for filing a false income tax return that was not due for months to come.

Having concluded that Harvey could not have invoked his fifth amendment privilege in 1980 on the ground that the information he was asked to reveal might incriminate him for future tax offenses, it follows, based on *Heike* and *Kastigar*, that neither the grant of transactional immunity nor the grant of use immunity prevents the government from pursuing Harvey's prosecution on counts three through six of the indictment. In affirming the district court, the majority erroneously "assumes the existence of a periphery of the Self-Incrimination Clause which ... supplies insulation for a career of crime about to be launched." *United States v. Freed*, 401 U.S. 601, 606–07, 91 S.Ct. 1112, 1117, 28 L.Ed.2d 356 (1971). I would reverse the district court as to counts three through six. Accordingly, I dissent.[13]

---

**11.** Counts three through five of the indictment charged Harvey with evasion of income taxes for the years 1980, 1981, and 1982, offenses that could not have occurred until April of 1981, 1982, and 1983, when Harvey filed his tax returns for the preceding years. *See Sansone v. United States*, 380 U.S. 343, 351, 85 S.Ct. 1004, 1010, 13 L.Ed.2d 882 (1965) (violation of 26 U.S.C. § 7201 does not occur until the defendant commits an affirmative act constituting an evasion or attempted evasion of the tax). Furthermore, the crime of willfully filing a false tax return for income earned in 1980, as charged in count six of the indictment, could not have occurred until April of 1981 when Harvey filed the allegedly fraudulent return. *See United States v. Bishop*, 412 U.S. 346, 357–58, 93 S.Ct. 2008, 2016, 36 L.Ed.2d 941 (1973). Thus, although the crimes charged in Counts three and six of the indictment related to Harvey's 1980 taxes, the immunity granted in 1980 did not apply to these crimes, as they did not occur until April of 1981, well after immunity was granted.

**12.** The interest Harvey earned in 1980 was not required to be reported until April of 1981. *See supra* note 11.

**13.** The majority asserts that because of "the most unusual circumstances of this case," specifically the government's failure to keep a record of its agreement with Harvey and the resulting confusion as to its exact parameters, it is "obliged to conclude that the traditional law pertaining to transactional and use immunity is inapposite and does not control the disposition of the government's appeal." The majority, however, does not explain why this case is any different from the legion of cases in which facts are unknown or unclear, and a factfinder is relied upon to sort out a confusing situation. Here, the magistrate found, as a matter of fact, that Harvey had been granted use and transactional immunity in 1980. I do not read the majority as holding that this finding is clearly erroneous. Therefore, I do not understand why the majority concludes that "the traditional law pertaining to transactional and use immunity is inapposite and does not control" this case.

I also perceive a weakness in one of the factual assumptions underlying the majority opinion. The majority repeatedly states that Harvey may have been misled into believing that he was immune from prosecution for future crimes and therefore, as a matter of fairness, all doubts as

to the scope of the agreement should be resolved in favor of Harvey. The record in this case, however, indicates that Harvey never believed that he was immune from prosecution for future crimes. For example, at the pre-*Kastigar* hearing, Harvey testified that during the September, 1980 meeting with the DEA agents his attorney reminded the agents of the scope of Harvey's immunity by stating that Harvey had complete immunity and there was nothing the government could "ever do about what he has done in the past." Furthermore, Harvey testified on cross-examination that he believed he had complete immunity for crimes he had committed from 1975 until 1980, but that the agreement did not "cover anything" past 1980.

Other events also suggest that Harvey never believed that the agreement extended to crimes committed after the agreement was reached. In 1983, Harvey was subpoenaed to testify at the trial of Scott Combs, who had been indicted for various drug offenses. At this point, the IRS was investigating Harvey for the tax offenses charged in this case. Harvey's attorney somehow found out about the investigation and made a written request for immunity in ex-

change for Harvey's testimony at Combs's trial. The letter requesting immunity states that Harvey had "certain real concerns about his possible exposure to criminal prosecution by [the IRS] if he voluntarily testifies at [the Combs] trial." Immunity was not granted and when Harvey was called to testify at Combs's trial, he asserted his fifth amendment privilege in response to any questions that could in any way be related to the tax case. Had Harvey believed that he was immune from prosecution for the tax crimes as a result of the 1980 agreement, he hardly would have perceived a need to ask for immunity and assert his fifth amendment privilege in the 1983 trial.

Regardless of what Harvey actually believed the scope of the 1980 agreement to be, I would still reverse the district court as to counts three through six of the indictment, because a defendant's belief that an immunity grant extends to future crimes would be unreasonable. I have included this discussion only because I believe that the majority's attempt to portray Harvey as some sort of dupe mischaracterizes the record and considerably weakens its "fundamental fairness" argument.