UNITED STATES of America,
Plaintiff-Appellee,

v.

Enrique H. CALIMANO,
Defendant-Appellant.

No. 77–5386.

United States Court of Appeals,
Fifth Circuit.

July 13, 1978.

Rehearing Denied Sept. 20, 1978.

Barry A. Cohen, Tampa, Fla., Joseph Beeler, Miami, Fla., for defendant-appellant.

John L. Briggs, U. S. Atty., Jacksonville, Fla., W. Christian Hoyer, Asst. U. S. Atty., Tampa, Fla., for plaintiff-appellee.

Before GEWIN, GODBOLD and MORGAN, Circuit Judges.

GEWIN, Circuit Judge:

On February 14, 1977, Enrique Calimano was convicted in a non-jury trial of knowingly using a document containing a false material declaration in a proceeding before a grand jury and with knowingly making a false material statement while testifying before a grand jury.[1] On appeal Calimano presents a number of issues, only two of which require our attention. (1) He contends that the district court erred in denying specific performance of an alleged agreement by the prosecutor to dismiss the indictment against him in return for information concerning Medicare fraud. (2) He also claims that the questions asked at the grand jury proceedings which led to his conviction were too ambiguous and confusing to support that conviction. We find no merit in these contentions or the other issues raised by appellant and affirm.

In September of 1973 Calimano went to work as a billing and procedures clerk at Gulf Coast Home Health Services in St. Petersburg, Florida. This enterprise had been started by Calimano's friends, Paul and Nancy Dudley, on a loan from Calimano's father, for the purpose of providing home health care services to Medicare patients. In May of 1974 the Dudleys opened a sub-agency of Gulf Coast in Tampa, Florida, which they sold some months later to Calimano and his wife for approximately $5,000.

Because of Calimano's alleged inexperience in operating a home health care agency he entered into a contract on July 4, 1974, with the Dudleys whereby the Dudleys were to set up the agency under the Calimanos' ownership. In return for their consultations the Dudleys were to receive $15,000 payable on July 3, 1975. This amount was paid by May of 1975 and was charged to Medicare as a reimbursable expense.

In June or July of 1975, Mr. Dudley informed Calimano that he wanted to revise the July 4, 1974 contract to make it more "specific" and in "tune" with the type of consulting being performed. Dudley then sent Calimano a copy of the revised contract in late September or early October of 1975 which Calimano and his wife signed. The revised contract, like the original, was dated July 4, 1974, and also, like the original, listed a debt of $15,000 payable by July 3, 1975. The revised contract, however, contained additional provisions in regard to the Dudleys' services. Most significantly the new contract provided that services provided by the Dudleys were to be performed on weekends and after business hours "so as not to comprise the Consultant Agency's business operation." (Gov. Exh. 2A, Appx. p. 9–10).

On April 21, 1976, Calimano was interviewed by an investigator from the Bureau of Health Insurance and a Mr. Hoyer, the United States Attorney who subsequently prosecuted Calimano for perjury. During

---

1. Both offenses for which Calimano was convicted were in violation of 18 U.S.C. § 1623 which states in pertinent part:

(a) Whoever under oath (or in any declaration, certificate, verification, or statement under penalty of perjury as permitted under section 1746 of title 28, United States Code) in any proceeding before or ancillary to any court or grand jury of the United States knowingly makes any false material declaration or makes or uses any other information, including any book, paper, document, record, recording, or other material, knowing the same to contain any false material declaration, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

In addition Calimano was convicted of violating 18 U.S.C. § 2 (aiding and abetting). This charge was made in the same count of the indictment which charged him with knowingly using a document containing a false statement.

that interview Calimano was asked if he had a consulting agreement with Mr. Dudley. He replied affirmatively and gave them a copy of the revised agreement. Not long after this interview Calimano was subpoenaed to appear before a grand jury investigating funding improprieties in the home health care industry. He reported to the grand jury on May 12th but did not testify until the following day. During his testimony he stated that he had signed the revised contract on July 4, 1974, at the Dudleys' residence and that it was the only consulting contract he had ever entered into. However, it was later shown that the revised contract had been written on paper manufactured subsequent to July 4, 1974. (Appx. p. 62). As a result of these answers and his use of the revised contract before the grand jury, Calimano was indicted for perjury on June 9, 1976.[2]

## I.

Counsel for appellant strongly contends that the court erred in refusing to enforce an alleged promise to dismiss the indictment against Calimano if Calimano would provide information about illegal activities in the home health care industry. This issue originated in discussions held some months prior to trial between the prosecutor and Calimano's trial counsel regarding the possibility of Calimano receiving leniency in return for his aid in the government's Medicare fraud investigation. On November 5, 1976, Calimano and his attorney met with the prosecutor, and a Mr. Lemon, an HEW investigator. At this meeting Calimano claims to have provided information about certain illegal activities in the home health care industry, although, as previously agreed, Calimano was not required to answer questions involving the perjury charges against him.

On November 22, 1976, Calimano's attorney wrote the prosecutor a letter to confirm what he claimed was an agreement by the prosecutor to drop the perjury charges against Calimano in return for the information given on November 5th. In a letter of reply dated December 16 the prosecutor denied that such an agreement existed.

Prior to trial Calimano filed a motion for specific performance of the agreement or, in the alternative, to dismiss the indictment. The trial court conducted an extensive evidentiary hearing on the motion and after careful consideration of all the evidence before it denied the motion on the grounds that the evidence failed to show a promise by the government to dismiss the indictment or that the defendant suffered any "legal prejudice" as the result of any actions by the government. Upon review of the record we decline to disturb the district court's finding.

The record reveals a serious dispute between the prosecutor and defense counsel concerning the existence of an agreement to dismiss the indictment. At the hearing on the motion the prosecutor admitted that he had discussed the possibility with defense counsel of according Calimano some form of leniency, including dismissal of the indictment. However, according to the prosecutor, any benefit flowing to Calimano from the government was conditioned upon the value of the information provided by Calimano. As the prosecutor stated: "Obviously, I am not going to say just come on in and get your charges dismissed, and say get what you want." (H. p. 24).[3] The prosecutor claimed that the interview with Calimano produced nothing of sufficient value to warrant dismissal and, further, denied that he had made an absolute promise to dismiss the charges against appellant. (H. p. 39).[4]

---

**2.** Paul and Nancy Dudley were also indicted along with Calimano for violation of 18 U.S.C. § 1623. On September 17, 1976, their trial was severed from the Calimano trial.

**3.** The letter H refers to the pretrial motion hearing.

**4.** Mr. Hoyer, in response to questioning by the trial judge, testified that he had to obtain permission from his superior before he could dismiss an indictment and that he had not sought such permission in this case because he lacked justification for doing so. (H. p. 50–51).

Defense counsel, on the other hand, interpreted his discussions with the prosecutor in a different light. He testified that they had originally discussed dismissal of the indictment on October 20, 1976, and that the agreement to dismiss was finalized on November 4, 1976. (H. p. 171–72). He contends that this agreement was reaffirmed at the November 5th interview with Calimano. However, none of the other individuals present at that meeting heard the agreement reaffirmed. The prosecutor, of course, denied that he agreed to dismissal at this meeting. (H. p. 24). Mr. Lemon, the HEW investigator, testified that he had no memory of defense counsel restating any agreement to dismiss the indictment, and that there was no record of any conversation on this subject in the notes that he took during the interview. (H. p. 95). Calimano remembered his attorney mentioning the agreement but, strangely, failed to recall the prosecutor's response. (H. p. 127–28). Indeed, Calimano testified that he never heard the prosecutor promise to dismiss the charges against him. (H. p. 136).

■ The trial judge was thus essentially faced with two conflicting interpretations of discussions held between opposing counsel. The court discredited the testimony of neither attorney but simply found that the evidence failed to show "that the Government made a firm promise or commitment to dismiss the indictment." (H. p. 208). We cannot say that this finding was clearly erroneous.

■ Additionally we might also note, as the trial court found, that Calimano sustained no prejudice as a result of the November 5th interview. See United States v. Goodrich, 493 F.2d 390, 393 (9th Cir. 1974). Calimano entered no plea nor did he make any self-incriminating statements. In fact it was understood that at the interview Calimano would not be asked any questions concerning the perjury charges against him and that he would not testify for either party at the Dudleys' trial (H. p. 48–49).

■ One further matter concerning this issue deserves attention. Appellant's counsel argues that the trial court arrived at its decision by applying an incorrect legal standard to the facts. This argument is based upon the court's statement that "there was no clear meeting of the minds" of the parties concerning the alleged agreement [5] and this court's holding in Johnson v. Beto, 466 F.2d 478, 480 (5th Cir. 1972), that the existence of a plea bargaining agreement is measured by objective standards, not the subjective beliefs of the parties. In Johnson, however, it was undisputed that the prosecutor made two unequivocal offers to the defendant to recommend a sentence reduction in return for a guilty plea.[6] Here, the existence of an unequivocal promise by the prosecutor was itself at issue. In our opinion the district court decided this issue upon a fair, thorough, and objective examination of the evidence. Additionally, our own independent review of the objective facts revealed by the record leads us to conclude that the court below did not arrive at a clearly erroneous decision.

## II.

Appellant also argues that the questions posed to him at the grand jury investigation concerning the consulting contract were too imprecise and ambiguous to support a conviction of perjury in that they failed to distinguish between the original consulting agreement and the revised version of that agreement and also failed to

---

5. This statement was made in the following context:

And I might say that I do not discredit either or any of the lawyers involved with respect to what they say their understanding was.

By the same token, it is patent that—to me, at least—that there was no clear meeting of the minds, and I am not persuaded on the basis of the testimony and evidence presented in this particular proceeding that the Government made a firm promise or commitment to dismiss the indictment.
(H. p. 207–08).

6. If anything Johnson supports the lower court's decision in that it requires that a plea bargaining agreement must be given "explicit expression" and not derive from "mere expectation and hope." 466 F.2d at 480.

distinguish between the agreement with the Dudleys and the document evidencing that agreement. Calimano claims that he believed the two versions of the contract were the same agreement. Thus, when questioned at the grand jury proceeding concerning the signing of the revised contract, appellant contends that he truthfully answered that he signed on July 4, 1974, since that was the date on which the original consulting contract had been signed.

Our examination of the questions asked Calimano before the grand jury, however, reveals none of these alleged ambiguities. When Calimano testified he had the revised contract before him. He was then questioned concerning that document as follows:

Q. Is that your signature on the page?

A. Yes, it is.

Q. And did you sign that on the date indicated?

A. Yes, I did.

Q. And what date is that?

A. That's the 4th of July.

Q. Of what year?

A. 1974.

Q. And that's when you signed it?

A. Right.

Q. And where were you when you signed it?

A. We were at the residence of the consultants.

Q. Mr. and Mrs. Dudley?

A. Correct.

Q. You were at their house when you signed it?

A. Yeah.

Q. Were all four of you present, the four people that signed that?

A. Yeah.

(Appx. p. 48).

Later in the proceedings appellant was again questioned about the revised contract.

Q. Right. Now, when you started—well, I said we're not going to get too much into your personal business with Tampa Gulf Coast at this time, just your relationship with Mr. Dudley. Have you had any other contracts or agreements that you've

signed with Mr. Dudley for anything, any other contracts or agreements that you've had with Mr. Dudley or Gulf Coast?

A. I can't recall of any.

Q. And did you have any other consulting agreements with Mr. Dudley beyond the one you showed us, Exhibit 2A?

A. Besides the others, you mean?

Mr. Hoyer: Would you show him Exhibit 2A?

(Foreman hands exhibit to witness.)

A. Well, there's that other figure of two thousand three that I gave you.

Q. Right, but I'm talking about a contract and agreements, consulting agreements. Is that the only one, the one you are holding in your hand, Exhibit 2A?

A. Yes.

Q. Is that the only one you've ever had?

A. Right.

Q. The only one you've ever signed?

A. Right.

(Appx. p. 56–57).

■ Contrary to appellant's contentions the preceding questions are clear and precise. With a copy of the revised contract before him, Calimano was asked if his signature was on the document and if he signed on the date written on the contract—July 4, 1974. He replied affirmatively. He was then asked where he signed it and if all of the persons who signed it were present at that time. Calimano answered that the contract was signed at the Dudleys and that all the signers were present. Later on in the proceeding, with the revised contract in his hand, he was asked if the contract he was holding was the only consulting agreement he had ever had or signed with the Dudleys and again he replied affirmatively.

■ These questions clearly distinguished the original contract from the revised contract on the basis of the place the original contract was signed, the date on which it was signed, and the persons present when it

**642**

was signed. Thus, we can hardly give credence to appellant's claim that the questions failed to apprise him of the contract to which the prosecutor was referring. Likewise, we fail to see any merit in appellant's argument that he thought the two written contracts constituted a single contract entered into on July 4, 1974. This contention was thoroughly explored by the trial judge who found that in addition to the specific nature of the questions posed to Calimano, other circumstances in the case indicated that Calimano's answers were "knowingly false." Briefly, the court noted that Calimano was a well-educated and very intelligent businessman and that the original consulting agreement with the Dudleys was of such importance in his professional life that he would be unlikely to forget it. The court emphasized that the unusual nature of the revised contract and the fact that in late October or November of 1975 Calimano mentioned its existence to an auditor tended to cast doubt on Calimano's claim that the two contracts had merged as one in his mind. The court also took note of the fact that Calimano had discussions with Mr. Dudley regarding their upcoming appearances before the grand jury, that these discussions involved the consulting contract, and that appellant testified on the day following Mr. Dudley's testimony regarding the revised contract. We agree with the trial judge that in light of these circumstances and the questions asked Calimano during the grand jury proceedings, it is "absolutely incredible" that Calimano did not know that the revised contract was a separate document from the original consulting contract.

The judgment of conviction is AFFIRMED.