UNITED STATES of America, Plaintiff,

v.

Luis LUA; Aurelio Ortiz Jr.; Shawn Wayne Knakmuhs; Benjamin L. Alden; Ricardo Castillo, a/k/a Juan Humberto Castillo–Alvarez; Sarah Ann Kozak; and Ramiro Astello, Defendants.

No. CR 97–3008–MWB.

United States District Court, N.D. Iowa, Central Division.

Jan. 15, 1998.

Janet L. Papenthien by oral arguments, Asst. U.S. Atty., Sioux City, IA, for Plaintiff.

Stanley E. Munger of Munger & Reinschmidt, Sioux City, IA, Jennifer A. Bicknese, Whitesell & Bicknese, Iowa Falls, IA, for Defendants.

**ORDER REGARDING DEFENDANT KOZAK'S MOTION TO DISMISS**

BENNETT, District Judge.

### TABLE OF CONTENTS

I. *INTRODUCTION AND BACKGROUND* ..................................... 706

II. *FINDINGS OF FACT* ................................................ 707

III. *LEGAL ANALYSIS* ................................................. 708
 A. *Overview of Cooperation Agreements* ...................................708
 B. *The Existence Of Cooperation Agreement In This Case* ..................710
 C. *Authority To Bind The United States* ..................................711

IV. *CONCLUSION* .....................................................714

Due process requires the government to adhere to the terms of any immunity agreement it makes. Courts are bound to enforce such agreements when the defendant has fulfilled his or her side of the bargain. The motion to dismiss presently before the court turns on the purported existence of an oral cooperation agreement reached by defense counsel and two state agents, and whether such a cooperation agreement is binding upon the United States.

### I. INTRODUCTION AND BACKGROUND

Defendant Sarah Ann Kozak ("Kozak"), along with Luis Lua, Aurelio Ortiz, Jr., Shawn Wayne Knakmuhs, Benjamin L. Alden, Ricardo Castillo, and Ramiro Astello, is charged in a three count indictment returned on July 17, 1997, with kidnapping, in violation of 18 U.S.C. § 1201(a), conspiring to kidnap, in violation of 18 U.S.C. § 1201(c), and using a firearm during the commission of a crime of violence, in violation of 18 U.S.C. § 924(j). The allegations in the indictment all concern the kidnapping and murder of Gregory Sky Erickson.

Defendant Kozak has filed a motion to dismiss in this case. As grounds for her motion, defendant Kozak asserts that the government has breached a cooperation agreement she had with it and, as a result, its prosecution of her violates her right to due process. The government has filed a timely resistance to defendant Kozak's motion to dismiss. In its resistance, the government contends that no cooperation agreement was ever reached between defendant Kozak and Iowa law enforcement personnel. The government further asserts that even if a cooperation agreement does exist between Kozak and state actors, those state actors did not have authority to offer Kozak transactional immunity from federal prosecution.

An evidentiary hearing on defendant Kozak's motion was held on November 10, 1997, and November 21, 1997, at which the government presented the testimony of Assistant Emmet County Attorney Richard Meyer, Clay County Attorney Michael L. Zenor, Special Agents Kevin B. Curran and Robert Birnie of the Federal Bureau of Investigation ("FBI"), and Special Agent Dan Moser of the Iowa Division of Criminal Investigation ("DCI"). Defendant Kozak offered the testimony of John P. Whitesell and Jennifer A. Bicknese. The United States was represented by Assistant United States Attorney Janet Papenthien. Defendant Kozak was represented by Stanley E. Munger of Munger & Reinschmidt, Sioux City, Iowa, and Jennifer A. Bicknese of Whitesell & Bicknese, Iowa Falls, Iowa.

Although the court initially indicated to the parties that it would set defendant Kozak's motion for further oral arguments following the submission of supplemental briefs by the parties, upon review of the parties' submissions and the record in this case, the court concludes that oral argument would not be beneficial. Therefore, the oral arguments

will not be scheduled and defendant Kozak's motion to dismiss is deemed fully submitted.

## II. FINDINGS OF FACT

For the purpose of this motion only, the court finds the following facts:

On June 14, 1997, Gregory Sky Erickson's body was found in an abandoned farmhouse in Jackson County, Minnesota. A criminal investigation was commenced involving local, state, and federal law enforcement agencies. On June 17, 1997, a car owned by defendant Kozak's father, Laddie Kozak ("Laddie"), and which defendant Kozak had been using, was seized by law enforcement officers pursuant to a search warrant. Also on June 17, 1997, Dan Moser of the DCI and Paul Soppeland of the Minnesota Bureau of Criminal Apprehension ("BCA") interviewed defendant Kozak. During this interview defendant Kozak admitted driving defendants Luis Lua and Aurelio Ortiz to an apartment in Spencer, Iowa, and driving Lua, Ortiz and Erickson back from Spencer to Estherville, Iowa. Defendant Kozak further told the officers that she had dropped Lua and Erickson off at Lua's house, and dropped Ortiz off at his apartment. She also claimed to have seen Erickson walking away from Lua's house on June 6, 1997, and to having spent the rest of that evening with Lua. The law enforcement authorities investigating the death of Erickson believed these last two statements to be false.

The next day, June 18, 1997, Laddie telephoned John P. Whitesell, an attorney who had previously represented Laddie on other legal matters, and requested an emergency appointment for later that day. Laddie explained to Whitesell that an automobile he owned, but which Kozak had been using, had been seized by law enforcement officers the previous night. Whitesell made arrangements for himself and his law partner, Jennifer Bicknese, to meet with defendant Kozak and her parents, Laddie and Zoe, that evening. Whitesell requested that Bicknese contact DCI Special Agent Dan Moser regarding the seizure of Laddie's automobile.

At approximately 1:45 p.m., Bicknese telephoned the Law Enforcement Center in Estherville and spoke with Special Agent Moser and Assistant Emmet County Attorney Richard Meyer. Bicknese inquired about Laddie Kozak's car. She was informed that the automobile had been seized pursuant to a search warrant in a kidnapping investigation, and that the automobile had been transported to a crime laboratory in St. Paul, Minnesota. Bicknese was also told of the ongoing homicide investigation, and that the investigation was a multi-jurisdictional effort which involved Iowa, Minnesota and federal authorities. Bicknese informed Moser and Meyer that she represented Kozak. Bicknese was then told by Moser that he believed Kozak had been the driver of a car involved in the crime. Bicknese was also told that Kozak had been questioned the previous evening, and that Moser did not believe Kozak had been entirely truthful in her statement to the officers. Bicknese was told that it was in Kozak's interest to be re-interviewed. Bicknese was told that a "window of opportunity" existed for defendant Kozak to be a material witness rather than a defendant but that the window could close quickly due to the rapidly evolving nature of the investigation. Bicknese requested that there be no further contacts with Kozak in Bicknese's absence, and Moser and Meyer agreed to that condition.

Later on June 18, 1997, law enforcement officers arrested Ortiz, Shawn Knakmuhs, and Ben Alden. The three men were interrogated and, as a result of this questioning, the alleged murder weapon was recovered. The issue of possible deals with the perpetrators of the Erickson kidnapping was discussed that evening at the Emmet County Law Enforcement Center. Present at the time was Meyer and Kevin Curran, Supervising Resident Agent for the Federal Bureau of Investigation. Curran stated his belief that there should be no deal for Kozak because she had lied to law enforcement officers the previous night.

At approximately 6:30 p.m. on June 18, 1997, Kozak and her parents met with Whitesell and Bicknese. Bicknese and Whitesell then met privately with Kozak for three hours. Whitesell told Kozak that there was an opportunity for her to be a material witness rather than a defendant in the criminal

case being prepared regarding Erickson's kidnapping. Kozak informed Whitesell that she would take the opportunity to be a material witness. Whitesell requested that Bicknese contact the authorities the next morning to ascertain what was required for Kozak to become a material witness.

On June 19, 1997, at approximately 8:44 a.m., Bicknese contacted Moser and Meyer regarding having Kozak take advantage of the window of opportunity spoken of the previous day. Bicknese was told that it was uncertain whether it was going to be a federal case or a state case, and that the situation was "very fluid" in that information was being developed constantly. Meyer informed Bicknese that the "window of opportunity" to negotiate a deal was closing rapidly because of the rapid pace at which the case was developing, and that Kozak's information might not be needed by the time she was willing to provide it. Meyer further told Bicknese that if she wanted to attempt to negotiate a deal she and Kozak would have to come into the law enforcement center immediately.

At approximately 9:17 a.m., Whitesell called Moser and informed him that he and Bicknese were on their way to Estherville. Whitesell told Moser that they were going to take advantage of the window of opportunity offered to defendant Kozak. Whitesell and Bicknese canceled their other appointments for the day and drove from their law office in Iowa Falls, Iowa, to the Kozak residence in Estherville.

Following Whitesell's telephone call to Moser, a discussion ensued at the law enforcement center over whether a deal would be offered to Kozak. Among those present at the meeting were Moser, Meyer, Curran, and Clay County Attorney Michael Zenor. At the meeting Curran again voiced his opinion that no deal should be offered to Kozak. After an assessment of the information gathered up to that point, the decision was made to charge Kozak, Ramiro Astello, Juan Astello, and Ricardo Castillo with first degree kidnapping.

Bicknese and Whitesell arrived at the Kozak residence at approximately noon on June 19, 1997. From Kozak's house, Bicknese telephoned the law enforcement center and spoke with Moser. Bicknese told Moser that she and Whitesell were in town and would bring Kozak in to the law enforcement center to give a statement. Moser informed Bicknese that an arrest warrant had been issued for Kozak. Bicknese told Moser that she was going to discuss the situation with Kozak and her parents, and would then bring Kozak down to the law enforcement center to surrender herself. After Bicknese spoke to Moser, a discussion ensued at the law enforcement center over whether a deal would be tendered to Kozak. It was again decided that no deal would be extended to Kozak because the case was moving too rapidly.

Kozak, Whitesell, and Bicknese later arrived at the law enforcement center. Kozak and her counsel were told by Zenor that no deals for Kozak were available at that time. Moser inquired whether Kozak would be willing to consent to a second interview. With her counsel present, Kozak agreed to be interviewed a second time. She was then questioned by Moser and Soppeland with her attorneys present.

FBI agents are not authorized to bind the United States Attorney's Office nor to offer prosecutorial immunity to individuals. Rather, Assistants United States Attorney in the United States Attorney's Office are charged with offering and making immunity deals which bind the United States in criminal prosecutions.

## III. LEGAL ANALYSIS

### A. Overview of Cooperation Agreements

 In order to secure an individual's cooperation, the government may informally grant the individual immunity in exchange for his cooperation. *United States v. Fitch,* 964 F.2d 571, 574 (6th Cir.1992); *United States v. Pelletier,* 898 F.2d 297, 301 (2d Cir .1990). Agreements to exchange cooperation for transactional immunity are generally governed by traditional principles of contract law.[1] *United States v. Crawford,* 20 F.3d

---

1. Transactional immunity is full immunity from

prosecution for any offense to which the testimo-

933, 935 (8th Cir.1994); *United States v. Johnson,* 861 F.2d 510, 512 (8th Cir.1988); *United States v. Brown,* 801 F.2d 352, 354 (8th Cir.1986); *accord United States v. McHan,* 101 F.3d 1027, 1034 (4th Cir.1996), *cert. denied,* 117 S.Ct. 2468, 117 S.Ct. 2468, 138 L.Ed.2d 223; *United States v. $87,118.00 in U.S. Currency,* 95 F.3d 511, 517 (7th Cir.1996); *United States v. Dudden,* 65 F.3d 1461, 1467 (9th Cir.1995); *United States v. Thompson,* 25 F.3d 1558, 1562 (11th Cir. 1994); *Fitch,* 964 F.2d at 575; *United States v. Liranzo,* 944 F.2d 73, 77 (2d Cir.1991); *United States v. Weaver,* 905 F.2d 1466, 1472 (11th Cir.1990); *United States v. Irvine,* 756 F.2d 708, 710 (9th Cir.1985); *Rowe v. Griffin,* 676 F.2d 524, 528 (11th Cir.1982). As the Eighth Circuit Court of Appeals has observed:

> A cooperation agreement is somewhat analogous to a plea agreement except that the former is a "prosecutorial agreement, the unviolability of which rested completely in the province of the government prosecutors, who have the sole power and responsibility to institute criminal proceedings." *United States v. Minnesota Mining and Manufacturing Company,* 551 F.2d 1106, 1112 (8th Cir.1977). With an agreement not to prosecute, parties agree that the defendant's cooperation is sufficient consideration for the government's promise of immunity.

*Johnson,* 861 F.2d at 513 (citing *United States v. McGovern,* 822 F.2d 739, 745 (8th Cir.1987)); *see Crawford,* 20 F.3d at 935; *Brown,* 801 F.2d at 354; *United States v. Carrillo,* 709 F.2d 35, 36 (9th Cir.1983).

■ The language of the cooperation agreement is to be read as a whole and given a reasonable interpretation. *Brown,* 801 F.2d at 354; *accord Irvine,* 756 F.2d at 710; *United States v. Baldacchino,* 762 F.2d 170, 179 (1st Cir.1985); *Carrillo,* 709 F.2d at 36; *United States v. Calabrese,* 645 F.2d 1379, 1390 (10th Cir.), *cert. denied,* 454 U.S. 831, 102 S.Ct. 127, 70 L.Ed.2d 108 (1981). "While a contract is made when the parties verbally express their mutual assent to its essential terms, it may also be implied when the parties' conduct manifests their agreement."

*McHan,* 101 F.3d at 1034 (citing RESTATE-MENT (SECOND) OF CONTRACTS § 19 (1979)). If there is any ambiguity in the language of the cooperation agreement, the ambiguity will be resolved against the government. *Dudden,* 65 F.3d at 1467; *United States v. Plummer,* 941 F.2d 799, 804 (9th Cir.1991).

■ Unlike a regular commercial contract, however, due process requires that the government adhere to the terms of any immunity agreement it enters into with a defendant. *Thompson,* 25 F.3d at 1562; *Pelletier,* 898 F.2d at 304; *United States v. Harvey,* 869 F.2d 1439, 1443–44 (11th Cir.1989); *see $87,118.00 in U.S. Currency,* 95 F.3d at 517. The Eighth Circuit Court of Appeals has held that granting specific performance of a cooperation agreement is appropriate unless:

> 1) the government made no firm promise of immunity, *United States v. Calimano,* 576 F.2d 637, 640 (5th Cir.1978); *United States v. Weiss,* 599 F.2d 730, 735 (5th Cir.1979); 2) the defendant failed to fulfill her part of the bargain, *Brown,* 801 F.2d at 355; 3) the government's offer of immunity or the defendant's acceptance was based on a mistake in law or fact, [*United States v. Coon,* 805 F.2d 822, 823 (8th Cir.1986)]; *Stokes v. Armontrout,* 851 F.2d 1085, 1090 (1988); 4) the term for which the defendant seeks specific performance was not a term of the contract, *Coon,* 805 F.2d at 823; *United States v. Carrillo,* 709 F.2d 35, 37 (9th Cir.1983); 5) the government's decision to seek an indictment was made in good faith, *McGovern,* 822 F.2d at 746; *Rowe v. Griffin,* 676 F.2d 524, 528–29 (11th Cir.1982); 6) the government's breach resulted in no prejudice to the defendant; *McGovern,* 822 F.2d at 746; or 7) specific enforcement would have an adverse impact on the public. *Id.*

*Johnson,* 861 F.2d at 512–13.

■ Additionally, pursuant to the concept of "equitable immunity," courts may enforce informal grants of transactional immunity where:

> "(1) an agreement was made; (2) the defendant has performed on his side; and (3) the subsequent prosecution is directly re-

ny relates. *Kastigar v. United States,* 406 U.S. 441, 453, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972).

lated to offenses in which the defendant, pursuant to the agreement, either assisted with the investigation or testified for the government."

*McHan,* 101 F.3d at 1034 (quoting *Rowe,* 676 F.2d at 527–28); *cf. Reed v. United States,* 106 F.3d 231, 235 (8th Cir.1997) (noting that while the doctrine of equitable immunity has not been recognized yet by the Eighth Circuit Court of Appeals, " 'the underlying principle is that when a promise of immunity induces a defendant to ... cooperate with the government to his [or her] detriment, due process requires that the prosecutor's promise be fulfilled.' ") (quoting *United States v. Fuzer,* 18 F.3d 517, 521 (7th Cir. 1994)). With these standards in mind, the court turns to consideration of the merits of defendant Kozak's motion to dismiss.

### B. The Existence Of A Cooperation Agreement In This Case

■ Applying basic contract principles to the alleged cooperation agreement in this case, in order to dismiss the indictment, the court must find that an agreement existed between the government and Kozak, that Kozak has substantially performed her part of the agreement, and that the government has breached the clear terms of the agreement. *See McHan,* 101 F.3d at 1034–35; *Thompson,* 25 F.3d at 1562–63; *Rowe,* 676 F.2d at 528. Accordingly, to succeed on her immunity claim, Kozak must demonstrate that an agreement was reached with the government under the terms of which the government would refrain from prosecuting her in exchange for her cooperation.

■ In order to create a valid contract, the parties must come to a "meeting of the minds." RESTATEMENT (SECOND) OF CONTRACTS § 17 comment c (1981). Thus, in the parlance of contract law, to succeed on her

transactional immunity claim, Kozak must demonstrate at least a meeting of the minds that the government would refrain from prosecuting her in exchange for her cooperation in the investigation. *See McHan,* 101 F.3d at 1034 (holding that defendant must demonstrate meeting of the minds in order to establish existence of immunity agreement); *United States v. Carrillo,* 709 F.2d 35, 36 (9th Cir.1983) (holding that cooperation agreement defendant entered into with the government did not include defendant's testifying at trial where there was no meeting of the minds as to that point); *cf. United States v. Barnes,* 83 F.3d 934, 938 (7th Cir.) ("When the government proposes a plea agreement, when the defendant accepts it and when the district court enforces it, there must be a meeting of minds on all of its essential terms."), *cert. denied,* 117 S.Ct. 156, 117 S.Ct. 156, 136 L.Ed.2d 101 (1996); *United States v. Robison,* 924 F.2d 612, 613 (6th Cir.1991) (holding that there can be no plea agreement without a meeting of the minds).

■ The testimony provided by Bicknese, Meyer and Moser contained contradictions and inconsistencies.[2] Bicknese testified that there was a cooperation agreement, and specified its provisions. Bicknese testified that on June 18, 1997, she was informed by Meyer and Moser that a window of opportunity existed for Kozak to be a material witness rather than a defendant in this case, but that the window was closing fast. She testified that after apprising Kozak of the window of opportunity to be a material witness, defendant Kozak agreed to be a material witness rather than a defendant. Bicknese testified that the next day, she relayed the fact that Kozak desired to be a material witness to Meyer and Moser, and inquired what information they desired from Kozak in order for her to be a material witness.

**2.** The court has utilized the following factors in assessing the credibility of the witnesses who testified at the evidentiary hearing: (1) the interest of the witness in the result of the hearing; (2) the witness's relation to any party in interest; (3) the witness's demeanor upon the witness stand; (4) the witness's manner of testifying; (5) the witness's tendency to speak truthfully or falsely, including the probability or improbability of the testimony given his or her situation to see and observe; (6) the witness's apparent capacity and

willingness to tell truthfully and accurately what he or she saw and observed; and (7) whether the witness's testimony is supported or contradicted by other evidence in the case. *See United States v. Phillips,* 522 F.2d 388, 391 (8th Cir.1975); *see also United States v. Merrival,* 600 F.2d 717, 719 (8th Cir.1979); *Clark v. United States,* 391 F.2d 57, 60 (8th Cir.), *cert. denied,* 393 U.S. 873, 89 S.Ct. 165, 21 L.Ed.2d 143 (1968); Manual of Model Jury Instructions for the District Courts of the Eighth Circuit 3.03 (1993).

For their part, Meyer and Moser both testified that no cooperation or immunity agreement was reached with Kozak. Both men conceded that they used the term "window of opportunity." [3] However, they also provided uncontradicted testimony that Bicknese was apprised of the fact that it was a multi-jurisdictional investigation and that it was uncertain whether Erickson's kidnapping was going to be a federal case or a state case. Bicknese was told that the situation was "very fluid" because information was being developed constantly.

Given these conflicts in the testimony, a finding that Bicknese and Meyer were credible would logically compel a conclusion that the parties had differing interpretations of the outcome of the negotiations. The court finds that Bicknese honestly believed an agreement existed. Bicknese clearly believed she had secured a cooperation agreement for Kozak whereby Kozak could become a material witness rather than a defendant. This is exemplified by the fact that upon conclusion of the second conversation Bicknese had with Meyer and Moser, she and Whitesell cleared their schedules for the day and immediately left for Estherville in order to consummate the cooperation agreement. The court also finds that Meyer honestly believed a cooperation agreement had not been reached. Meyer's testimony persuades the court that his statement to Bicknese, regarding a window of opportunity for Kozak to escape prosecution in exchange for some level of cooperation, was merely his position at the start of negotiations. The record indicates that during these discussions, Moser and Meyer made it clear that the question of prosecutorial jurisdiction over the case had not yet been determined. Put simply, Bicknese and Meyer never reached an understanding regarding a cooperation agreement for Kozak. By definition, this divergence does not constitute a meeting of the minds, and this court is unable to conclude that an accord was reached for a cooperation agreement for Kozak. Meyer's conversation with Bicknese was not intended to convey a final, integrated offer for a cooperation agreement for Kozak. Rather, he wished to impress upon Bicknese that there was a possibility to make a deal for her client, not that there was a fully integrated cooperation agreement on the table for acceptance. This is best illustrated by the paucity of detail regarding the terms of the "agreement" Bicknese allegedly reached with Meyer. Bicknese and Meyer never discussed such critical details as what level of cooperation would be required of Kozak in order for her to satisfy the purported cooperation agreement nor who would determine whether Kozak had fulfilled her part of the cooperation agreement. Under the circumstances, therefore, the court concludes that no meeting of the minds can be found to have existed between Meyer and Bicknese for a cooperation agreement for Kozak. Because the court concludes that there was no meeting of the minds necessary for the creation of a valid cooperation agreement for Kozak, no cooperation agreement exists here for the court to enforce. Therefore, the court denies defendant Kozak's motion to dismiss.

While this conclusion makes further analysis unnecessary, the court will nevertheless examine the question of whether a cooperation agreement reached with state actors is binding upon the United States.

## C. Authority To Bind The United States

Even if the court were to assume *arguendo* that Kozak has demonstrated the existence of a cooperation agreement between her and Iowa authorities, Kozak must also

---

3. The court finds Special Agent Moser's testimony regarding his meaning of the phrase "window of opportunity" to be incredible. Special Agent Moser testified that when he used that phrase he was trying to convey to Bicknese that Kozak had a chance to come in and give a second interview to the law enforcement officers regarding the Erickson investigation and that the significance of a second interview was possibly fleeting. Tr. at 181–85. According to Special Agent Moser, the "opportunity" he was speaking of was not an opportunity for Kozak to obtain a cooperation or plea agreement, but rather the prospect for law enforcement officers to procure useful information from Kozak through a second interview. *Id.* Such testimony is nonsensical. A lawyer would have no possible motivation to have his or her client give a second interview to law enforcement authorities when such action inures no benefit to the client.

demonstrate that the state cooperation agreement is binding on the United States.

Federal circuit courts of appeal have held that agreements made by state agents cannot be enforced against the United States because state agents are without authority to bind federal proceedings. *Hendrix v. Norris*, 81 F.3d 805, 807 (8th Cir.1996) (" '[S]tate prosecutors cannot bind federal prosecutors without the latter's knowledge and consent.' ") (quoting *United States v. Fuzer*, 18 F.3d 517, 520 (7th Cir.1994)); *United States v. Sparks*, 87 F.3d 276, 279 (9th Cir.1996) (holding that state prosecutors' agreements with defendant not binding on federal prosecutors); *United States v. Cordova–Perez*, 65 F.3d 1552, 1554 (9th Cir.1995) ("[I]t is well settled that states cannot bind the federal government to the terms of a plea agreement to which the federal government is not a party."), *cert. denied,* —— U.S. ——, 117 S.Ct. 113, 136 L.Ed.2d 65 (1996); *United States v. Allen,* 930 F.2d 1270, 1274 (7th Cir.1991) ("In general, the federal government is not bound by a plea agreement entered into in state proceedings."); *United States v. Roberson,* 872 F.2d 597, 611 (5th Cir.1989) (holding that state immunity agreement did not bind federal prosecutor); *United States v. Long,* 852 F.2d 975, 978 (7th Cir.1988) (holding that county officers were neither agents of the United States nor did they have any duty to investigate federal consequences of actions before securing defendant's cooperation); *Fourth Street Pharmacy v. United States Dep't of Justice,* 836 F.2d 1137, 1139 (8th Cir.1988) ("[N]either plea agreements negotiated by state prosecutors to which the federal government is not a party, nor subjective expectations of the parties regarding future federal action prevent federal agencies from independently enforcing compliance with federal law."); *Johnson v. Lumpkin,* 769 F.2d 630, 634 (9th Cir.1985) ("State agents are without authority to bind federal proceedings . . ."); *United States v. McIntosh,* 612 F.2d 835, 837 (4th Cir.1979) ("A bare representation by an unauthorized party cannot bind federal prosecutors to forego prosecution."); *United States v. Barker,* 542 F.2d 479, 482 (8th Cir.1976) ("The United States as a sovereign is not precluded from enforcing its laws by the grant of im- munity of another sovereign, in this case the state."); *United States v. Long,* 511 F.2d 878, 881–82 (7th Cir.) (holding that state's nonprosecution agreement did not bar subsequent federal prosecution), *cert. denied,* 423 U.S. 895, 96 S.Ct. 196, 46 L.Ed.2d 128 (1975).

In *Barker,* the Eighth Circuit Court of Appeals explained the legal rationale undergirding this principle:

> It is clear beyond doubt that one sovereign's grant of immunity is not ipso facto binding on another sovereign. As we stated in *United States v. First Western State Bank,* 491 F.2d 780, 783 (8th Cir.), *cert. denied,* 419 U.S. 825, 95 S.Ct. 42, 42 L.Ed.2d 49 (1974):
>
>> The sovereign not offering immunity has the undeniable right to protect the integrity of its law enforcement prerogatives by prosecuting anyone who allegedly has committed an offense against its peace and dignity. When its own evidence and investigation discloses acts of criminal activity, an undeniable right to prosecute exists. This right cannot be controlled, thwarted, or diminished by another sovereign granting immunity from prosecution of a kindred offense.
>
> Missouri officials could not and did not give Barker immunity from federal prosecution.

*Barker,* 542 F.2d at 482–83. The Fifth Circuit Court of Appeals expressed similar sentiments in *Roberson:*

> We conclude that the instant agreement fails the Rowe test with respect to the federal prosecution, simply because no "agreement was made" with federal prosecutors or regarding federal prosecution. If state agreements that immunize criminal defendants from state charges could bind federal prosecutors, state prosecutors would be able to usurp federal prosecutorial discretion.
>
> Nor did the state prosecutor in this case have any authority to bind the federal prosecutor. Under settled precedent, one federal prosecutor cannot bind his or her counterpart in another district unless he or she has been given the authority. *See United States v. D'Apice,* 664 F.2d 75, 78

(5th Cir. Unit B Dec.1981). If federal prosecutors cannot bind other federal prosecutors with their unauthorized acts, a state prosecutor *a fortiori* should not be able to do so.

*Roberson,* 872 F.2d at 611.

 Here, Kozak has not demonstrated that the state actors, Meyer and Moser, with whom her counsel conferred had been granted actual federal authority to negotiate a cooperation agreement.[4] The absence of an agency relationship between the United States and the Iowa agents who spoke to Kozak's counsel renders any cooperation agreement reached between the Iowa agents and Kozak unenforceable against the United States. The Seventh Circuit Court of Appeals' decision in *Long,* 511 F.2d 878, supports this conclusion. In *Long,* the court held that the federal government was not bound by an agreement made by the defendant and state agents. The Seventh Circuit Court of Appeals stated that "the existence of an agency relationship was essential to support" the enforcement of the agreement made. *Id.* at 881. The court concluded that because the state agents acted without actual or apparent federal authority, their promise to the defendant did not bind the United States. *Id.* As in *Long,* the Iowa actors here acted without actual authorization from the United States.

Kozak points to the fact that the Erickson investigation was a joint investigation involving local, state, and federal law enforcement agencies. Kozak argues that since Federal Bureau of Investigation ("FBI") agents were involved in the investigation, they presumably "gave express actual authority to the Iowa officials to offer Kozak material witness status in return for immunity." Kozak's br.

at 13. Kozak further contends that the FBI agents involved in the Erickson investigation were authorized to bind the United States. The flaw in Kozak's argument is two-fold. First, she has failed to demonstrate that any FBI agent gave express authority to Iowa officials to negotiate a cooperation agreement with Kozak on behalf of the United States. Neither testimony nor documentary evidence was offered that such a delegation of authority occurred during the Erickson kidnapping investigation.

 Second, Kozak has not demonstrated that the FBI agents involved in the Erickson investigation were authorized to bind the United States. The Eighth Circuit Court of Appeals has observed that " '[t]he rule requiring compliance by the government with promises made during plea bargaining and analogous contexts generally requires that the agent be authorized to make the promise.' " *Margalli–Olvera v. I.N.S.,* 43 F.3d 345, 353 (8th Cir.1994) (quoting *Thomas v. I.N.S.,* 35 F.3d at 1332, 1338 (9th Cir.1994)). The record in this case is devoid of any evidence establishing that the FBI agents assigned to the Erickson investigation were authorized to make promises in order to induce Kozak's cooperation. Indeed, Special Agents Curran and Birnie testified that FBI special agents do not negotiate cooperation agreements on behalf of the United States. Rather, such duty falls on prosecutors in the United States Attorney's office. As a result, there is no delegation of federal authority in the record.

It must be noted that courts have held that FBI and other federal law enforcement agents do not have authority to offer cooperation or plea agreements to defendants.[5] *See United States v. Streebing,* 987 F.2d 368, 372 (6th Cir.) (holding that defendant was not

---

4. Under traditional agency law, of course, authority can be either actual or apparent. *See* RESTATEMENT (SECOND) OF AGENCY § 27 (1958). However, with respect to the United States, authorization must be in the form of actual authority because the doctrines of estoppel and apparent authority usually do not apply to bind the government. *Margalli–Olvera,* 43 F.3d at 353 (citing *Thomas,* 35 F.3d at 1338). "Actual authority may be either express or implied (i.e., incidental to a grant of express authority)." *Margalli–Olvera,* 43 F.3d at 353.

5. Kozak's reliance on the Eighth Circuit's decision in *Margalli–Olvera* is misplaced. In *Margal-*

*li–Olvera,* an Assistant United States Attorney agreed that the government would recommend against deportation if the defendant participated in a debriefing; otherwise, the government would remain silent regarding deportation. *Id.* at 348. In upholding the authority of the Assistant United States Attorney to bind the INS to the plea agreement, the Eighth Circuit Court of Appeals held that a United States Attorney has authority to bind all governmental agencies to plea agreements. *See id.* at 353 ("[A]n Assistant United States Attorney enters into a plea agreement on behalf of the United States government as a whole. Accordingly, promises made by an

**714**

entitled to specific performance of alleged cooperation agreement entered into with FBI agent, who allegedly promised defendant he would not be prosecuted if he cooperated in making a statement, where there was no evidence establishing that agent was authorized to make promises to obtain defendant's cooperation), *cert. denied,* 508 U.S. 961, 113 S.Ct. 2933, 124 L.Ed.2d 683 (1993); *see also Cordova–Perez,* 65 F.3d at 1554 (holding that "even if the agent's comments could be construed as an implied promise that Cordova–Perez would not be prosecuted in federal court, Cordova–Perez is not entitled to the relief he seeks because he has not established that the INS agent was authorized to bind the United States Attorney."); *Fuzer,* 18 F.3d at 520 (holding that defendant failed to establish that ATF agents had authority to bind the United States Attorney); *United States v. Kettering,* 861 F.2d 675, 678 (11th Cir.1988) (holding that plea agreement with Drug Enforcement Agency agent not enforceable when agent was not authorized by United States Attorney to enter agreement); *United States v. Hudson,* 609 F.2d 1326, 1329 (9th Cir.1979) (holding that United States Attorney was not required to abide by a Secret Service agent's promise to a defendant to drop federal charges in exchange for defendant's cooperation where the United States Attorney never sanctioned the agreement and the promise was clearly outside the agent's authority); *cf. Johnson v. Lumpkin,* 769 F.2d 630, 633 (9th Cir.1985) (holding that a promise by FBI agents that defendant would serve no time on state charges if he cooperated in the federal investigation was unauthorized). Therefore, because Kozak has failed to establish that the FBI agents assigned to the Erickson investigation possessed actual authority to make an agreement with Kozak for her cooperation, the court may not dismiss the indictment in this case. Accordingly, defendant Kozak's motion to dismiss is also denied on this ground.

## IV. CONCLUSION

The court concludes that no meeting of the minds can be found to have existed between Meyer and Bicknese for a cooperation agreement for Kozak. Because the court concludes that there was no meeting of the minds necessary for the creation of a valid cooperation agreement for Kozak, no cooperation agreement exists here for the court to enforce. Therefore, Kozak's motion to dismiss is denied on the ground that no cooperation agreement was reached. The court further concludes that Kozak has failed to establish that the FBI agents assigned to the Erickson investigation possessed actual authority to make an agreement with Kozak for her cooperation. Accordingly, Kozak is not entitled to specific performance of the alleged cooperation agreement because Kozak has failed to establish that the FBI agents were authorized to make promises to obtain defendant's cooperation. Absent such authority, there is no delegation of federal authority in the record. Therefore, defendant Kozak's motion to dismiss is **denied.**

**IT IS SO ORDERED.**

Assistant United States Attorney bind all agents of the United States government. Therefore, we hold that unless a plea agreement uses specific language that limits the agents bound by the promise, ambiguities regarding the agencies bound by the agreement are to be interpreted to bind the agency at issue.").

